# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRESNO ROCK TACO, LLC, a California limited liability company; ZONE SPORTS CENTER, LLC, a California limited liability company,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>NATIONAL SURETY CORPORATION, a Fireman's Fund Company,<br><br>　　　　　　Defendant.<br>_____/ | Case No. 1:11-cv-00845-SKO<br><br>**ORDER IMPOSING JURY COSTS AND ATTORNEYS' FEES AND EXPENSES ON PLAINTIFF FRESNO ROCK TACO, LLC** |

## I.   INTRODUCTION

Re-trial in this matter was set for May 28, 2014. On the first day of trial, National Surety Corporation ("National") informed the Court that Plaintiff Fresno Rock Taco, LLC ("Plaintiff" or "FRT") had been suspended in April 2014 by the California Secretary of State and was legally prohibited from prosecuting its suit against National. FRT's managing member, Milton Barbis, attempted to ascertain the basis of the suspension and to effect revival, if possible, that same day. While FRT assessed its status, the Court proceeded with voir dire and selected a jury. FRT was to report to the Court by the close of business on May 28, 2014, whether revival had occurred. FRT

did not apprise the Court of its status at the close of the day; however, FRT informed the Court the next morning that it was unable to effect revival immediately and, although it believed the law entitled it to continue prosecuting its suit, it was alternatively entitled to a continuance of the trial while it attempted revival.[1]  Because the basis of FRT's suspension was not clear and because FRT could not provide a clear estimate of how long revival would require, the jury was dismissed, and FRT was granted a continuance of the trial to attempt to revive its status.

The issue before the Court is the jury costs and National's attorneys' fees incurred as a result of the last-minute continuance.  For the reasons set forth below, FRT is ORDERED to pay jury costs in the amount of $5,513.16 to the Court and attorneys' fees and expenses in the amount of $11,549.27 to National.

## II.   BACKGROUND

**A.   Notification of FRT's Inactive Status on the First Day of Trial**

On May 28, 2014, the first day of trial, National informed the Court that FRT was suspended and in "inactive" status pursuant to the California Secretary of State webpage as of April 1, 2014, and was, therefore, currently prohibited from litigating its case.  Mr. Barbis was instructed by the Court to ascertain the reasons for FRT's suspension and to apprise the Court whether FRT would be revived immediately.  On May 29, 2014, at 7:50 a.m., FRT, through its counsel, emailed the Court a brief regarding FRT's suspended status.[2]  In open court, FRT apprised the Court as follows:

> THE COURT:  When we were in court yesterday, [National] raised the issue that [FRT's] corporate status had been suspended.  And they could not proceed with the trial.  [FRT] could not proceed with trial.  So my question for you was: What is the cause of the suspension and how long will it take to cure that defect?
>
> . . .
>
> MR. SMITH:  Okay.  As to the cause, defense counsel – Mr. Barbis is happy to explain to the Court the cause.  Defense counsel is not entitled to know the specific

---

[1] When Plaintiffs' counsel was asked whether he and his clients wished to proceed on Plaintiff Zone Sports Center, LLC's case, Plaintiffs and counsel declined to do so.

[2] FRT failed to actually file its brief.  The brief FRT submitted to the Court via email on May 29, 2014.  On July 28, 2014, the Court directed the Clerk of the Court to file the brief, and it is now located at Docket No. 338.

2

reasons. They're irrelevant. And Mr. Barbis, frankly, doesn't know. He knows that it is suspended. He went up there and found that out. But several issues arose when he was there, after getting the run around up there. Mr. Barbis again is happy – which I did indicate in my brief. Happy to submit to the Court in camera as to those reasons, but not in open court because it's an invasion of privacy and all sorts of irrelevant – easy for me to say – issues.

As to the length, that's another thing. And I did not mention that and I apologize. And we don't know. Mr. Barbis has to talk to his CPA and there are – again, there are a host and a litany of issues that surfaced when he went up there. And so that's where the status is. And I apologize for not mentioning those in [the brief]. I did spend the bulk of my brief explaining why we shouldn't even really be addressing this issue because Mr. Hager is incorrect in his assumption that the whole case has to stop.

In its brief, FRT argued National's attempt to raise the issue of FRT's suspended status on the first day of trial was both untimely and improper. FRT asserted that any challenge to its authority to sue must be raised in a responsive pleading or by motion prior to filing a responsive pleading. By failing to plead a lack-of-capacity defense in its answer, which was filed on June 7, 2011, and amended on February 15, 2012, National has waived this defense. FRT argued that case law clearly indicates this case could proceed up to, but not including, judgment with FRT in its suspended status. Alternatively, FRT sought a continuance to enable it to revive itself.

FRT also asserted that National's counsel recklessly or without diligence misrepresented the law to the Court with a goal of delaying the trial. FRT sought sanctions against Defendant for the time its counsel spent preparing the brief emailed to the Court. Further, FRT argued that Mr. Barbis was forced to drive to Sacramento to determine why FRT was suspended, and argued National should absorb those costs as a sanction for improperly raising the issue of FRT's corporate status.

**B.     Continuance of Trial and Status Update**

The Court granted FRT a continuance to attempt to revive the corporation, and ordered that FRT file a status report by no later than June 27, 2014, indicating what FRT must do to revive its status and the amount of time necessary to do so. National was to respond to the status report by no later than July 11, 2014, addressing any issues raised in FRT's brief of May 29, 2014. FRT was permitted to file a reply no later than July 18, 2014.

On June 27, 2014, FRT filed a status report stating it had been suspended for failure to pay taxes and failure to properly file tax returns. FRT obtained a Certificate of Revivor on June 25, 2014, indicating that it was relieved of its suspension and was now in good standing with the Franchise Tax Board. (Doc. 333.)

On July 11, 2014, National filed a response arguing that it had not caused FRT's suspension, and it was harmed by FRT's failure to correct this deficiency prior to trial. National argues that FRT knew of the suspension well before trial but failed to disclose or correct the problem. National contends that Federal Rule of Civil Procedure 16(f)(1)(C) gives the Court authority to issue sanctions, which include attorney's fees, for violating the pretrial order. In addition to the jury costs assessed, National requests that FRT be ordered to pay National $11,549.27 for fees and expenses incurred as a result of the continuance.

On July 18, 2014, FRT filed a reply brief asserting the circumstances of this case are similar to that described by a California appellate court in *Color-Vue v. Abrams*, 44 Cal. App. 4th 1599 (1996) which counsel noted in open court on May 29, 2014, but failed to raise in FRT's May 29, 2014, brief. FRT contends National failed to address the *Color-Vue* or the issue of waiver.[3] FRT again asserts that it is not required to prove its standing as part of its case, and National has waived the issue by not raising lack of capacity as an affirmative defense in its answer. FRT asserts that *Color-Vue* requires National to bear the burden of the costs of impaneling a jury.

**C.  Order to Show Cause Regarding Jury Costs and Attorneys' Fees**

On July 28, 2014, the Court issued an order to show cause why jury costs and National's attorneys' fees should not be imposed on FRT due to its need for a last-minute continuance of the trial.

On August 5, 2014, FRT filed a response to the July 28, 2014, OSC, supported by an **unsigned** and **unsworn** "declaration" of Mr. Barbis. (Doc. 340-1.) Mr. Barbis' statement indicates he had no notice prior to May 28, 2014, that FRT had been suspended, and that the amount owed to the state of California was promptly paid on June 16, 2014. (Doc. 340-1.)

---

[3] Although National indicated in open court on May 29, 2014, that it received a copy of FRT's brief, the brief was not actually made part of the record by FRT. National will not be held accountable for failing to reference a case which was not cited in FRT's brief that FRT never filed.

4

### III.   DISCUSSION

**A.     The Effect of Corporate Suspension**

The capacity of a corporate litigant to sue or be sued in a federal court is controlled by Federal Rule of Civil Procedure 17.  Rule 17(b) provides that the capacity of a corporation to sue is determined "by the law under which it was organized."  Fed. R. Civ. P. 17(b)(2); *see also Hills Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 584 (9th Cir. 1993).  California law is therefore applicable in this case.

The "corporate powers, rights and privileges" of any domestic corporate taxpayer may be suspended for failure to pay certain taxes and penalties.  Cal. Rev. & Tax Code § 23301.  This means that the suspended corporation may not, among other things, prosecute or defend an action, seek a writ of mandate, appeal from an adverse judgment, or renew a judgment obtained before suspension.  *Grell v. Laci Le Beau Corp.*, 73 Cal. App. 4th 1300, 1306 (1999).

An objection that a corporation lacks capacity to maintain an action because its corporate powers have been suspended for nonpayment of taxes "is a plea in abatement which is not favored in law, is to be strictly construed, and must be supported by facts warranting abatement at the time of the plea."  *Traub Co. v. Coffee Break Serv., Inc.*, 66 Cal. 2d 368, 370-71 (1967).  Pleas in abatement do not challenge the justness or merits of a plaintiff's claim, but rather object to the place, mode, or time of asserting a claim.  *Nevills v. Shortridge*, 146 Cal. 277, 278 (1905).  Corporate incapacity is nothing more than a legal disability, depriving the party of the right to come into court and represent its own interests.  As such, lack of capacity is not a jurisdictional defect and may be waived if not properly raised.  *Am. Alternative Energy Partners II v. Windridge, Inc.*, 42 Cal. App. 4th 551, 559 (1996).  The capacity of a plaintiff to sue is not an element of the cause of action, and the corporation need not allege that it is qualified to do business in the state or that it has paid all its state taxes.  *Hydrotech Sys., Ltd. v. Oasis Waterpark*, 52 Cal. 3d 988, 994 n. 4 (1991).  A suspended corporation can regain its corporate powers by filing all required tax returns, paying the necessary taxes, penalties or fees due, and applying to the Franchise Tax Board for a certificate of reviver.  Cal. Rev. & Tax. Code § 23305.  This reinstatement or reviver

generally is "without prejudice to any action, defense or right which has accrued by reason of the original suspension or forfeiture . . . ." *Id.* § 23305a.

When a corporation's suspended status "comes to light during litigation, the normal practice is for the trial court to permit a short continuance to enable the suspended corporation to effect reinstatement (by paying back taxes, interest and penalties) to defend itself in court." *Timberline, Inc. v. Jaisinghani*, 54 Cal. App. 4th 1361, 1366 (1997). The main purpose of suspending corporations "is to put pressure on the delinquent corporation to pay its taxes, and that purpose is satisfied by a rule which views a corporation's tax delinquencies, after correction, as mere irregularities." *Id.*

**B.     Informing the Court of FRT's Suspended Status Was Not Improper or Untimely**

FRT asserts that *Color-Vue* is "on point" and stands for the proposition that FRT is not required to establish its corporate status as an element of its causes of action. As such, FRT contends National waived the issue of lack of capacity by not pleading it as an affirmative defense, National improperly waited until the first day of trial to raise the issue, and National should bear the jury costs associated with the continuance necessary for FRT to revive itself.

   **1.     *Color-Vue v. Abrams***

On July 11, 1991, Color-Vue, a California corporation, and its directors were sued by one of its former attorneys, Michael Abrams ("Abrams"), in municipal court for unpaid legal fees. *Color-Vue,* 44 Cal. App. 4th at 1602. On May 14, 1992, Color-Vue sued Abrams and another former attorney, James Leonard ("Leonard"), for legal malpractice. *Id.* Leonard cross-claimed against Color-Vue for unpaid legal fees, and the two cases were consolidated in November 1992. *Id.* Trial of the consolidated cases was set for April 26, 1994, and the matter was trailed and continued until it was finally set for trial on May 11, 1994. Meanwhile, Color-Vue had been suspended on December 1, 1992, for failure to pay its franchise taxes. *Id.*

On May 11, 1994, Color-Vue announced it was ready for trial, and Abrams moved to dismiss Color-Vue's action on the ground that Color-Vue had been suspended by the Secretary of State on December 1, 1992, for failure to pay its franchise taxes. *Id.* However, the certificate of suspension produced by Abrams was dated March 21, 1994, and Abrams had not raised this issue

in his April 25, 1994, Pretrial Conference Report as he was required to do. *Id*. Color-Vue moved for a continuance so that it could pay its taxes and have its corporate powers revived. *Id.* The court denied Color-Vue's motion and granted Abrams' motion to dismiss Color-Vue's complaint. *Id.* Abrams then dismissed Color-Vue's directors from his action for unpaid attorney's fees, was permitted to prove up his case against Color-Vue as an uncontested matter, and the court entered default judgment against Color-Vue on Abrams' complaint for attorney's fees. *Id.* In the meantime, however, Color-Vue paid its franchise taxes and obtained a certificate of reviver dated May 26, 1994. *Id.* The court's judgment was entered on May 27, 1994. *Id.*

On appeal, Color-Vue argued the trial court abused its discretion in denying its motion for a continuance, granting Abrams' motion to dismiss, and permitting Abrams to prove damages against Color-Vue in a default posture. *Id.* at 1603. Abrams and Leonard responded that Color-Vue was required to prove it was in good standing as part of its case, that Color-Vue was therefore not ready for trial, this "unreadiness" was due to Color-Vue's lack of diligence, and that they had no duty to raise the issue of suspension before the day of trial. *Id.*

The appellate court rejected Abrams and Leonard's arguments. The court first noted the difference between the capacity to sue and a party's standing to sue. *Id.* at 1604. A lack of capacity must be raised at the earliest opportunity or it may be waived. *Id.* Lack of standing, on the other hand, can be raised at any time and is not waivable because it implicates the right to relief in court and the existence of a cause of action. *Id.* Abrams and Leonard's argument regarding Color-Vue's lack of capacity was therefore waivable if not asserted at the earliest opportunity. *Id.* The court found that they knew by March 21, 1994, at the latest, that Color-Vue had been suspended but failed to raise the issue in the April 25, 1994, Pretrial Conference Report, which required all affirmative defenses to be listed. *Id.* at 1605. Moreover, the trial date, originally set for April 26, 1994, was continued three times before it was finally set for May 11, 1994, and Abrams and Leonard failed to raise the issue during that period as well. *Id.* As Abrams and Leonard had "ample opportunity to raise the issue of Color-Vue's suspension before the commencement of trial," but failed to do so until May 11, 1994, they had unnecessarily delayed raising the defense and it was therefore waived. *Id.* In a footnote, the court indicated because the

suspension occurred after the time to demur or answer, Abrams and Leonard should have moved the court for leave to file an amended answer asserting the plea. *Id.* at 1064 n. 5. The court also reasoned that Color-Vue was entitled to rely on Abrams' and Leonard's "silence" on the issue of the corporation's capacity to sue because it was not raised earlier. *Id.*

### 2. National Was Not Precluded From Informing the Court of FRT's Status

The issue of FRT's suspension was neither raised by National as an affirmative basis *to dismiss FRT's complaint*, nor presented to the Court pursuant to a motion to dismiss the complaint. National asserted only that FRT could not proceed to trial and prosecute its case due to California Revenue and Taxation Code § 23301. National acknowledged FRT was entitled to a continuance to seek revival of its corporate status.

FRT appears to argue that National was prohibited even from *informing* the Court of FRT's suspended status. FRT contends lack of capacity as an affirmative defense to the entire suit was waived because it was either not pled in the answer or not raised at some earlier moment. FRT cites no authority that National was precluded from *informing* the Court that FRT was suspended. On the contrary, it was incumbent upon National to inform the Court that FRT was not entitled to prosecute its action while suspended. *See generally Palm Valley Homeowners Ass'n, Inc. v. Design MTC*, 85 Cal. App. 4th 553, 556 (2000) ("The rule is clear that a corporation suspended for nonpayment of taxes may not defend itself in litigation.") National's counsel owed a duty of candor to the Court to report its discovery of FRT's suspended status. *Id.*

Further, while FRT maintains the case could have proceeded through trial while it was in suspended status so long as FRT revived before judgment was entered, FRT indicated to the Court on May 29, 2014, that it had no idea why it was suspended and that "there are a host and a litany of issues that [had] surfaced." While the appellate court in *Color-Vue* noted the trial court could have taken the motion to dismiss under submission and simply gone to trial while Color-Vue attempted to revive, *Color-Vue*, 44 Cal. App. 4th at 1606 n. 7, here there was no information that FRT *could* revive itself or *how long* that would take. In this factual posture, by allowing the trial to commence, the purpose of Section 23301 – leverage to force payment of corporate taxes – could have been entirely undercut. Had trial continued, FRT's motivation to revive would only be

8

maintained if it won the case or it decided to appeal an adverse judgment. Had FRT been unable to revive or simply decided against reviving its status following trial, then dismissal may very well have been appropriate without a jury trial. Adopting a wait-and-see posture as to FRT's revival while proceeding with trial not only created potential to waste enormous public, private, and judicial resources, it also could have worked an end-run around the intent of Section 23301 by allowing FRT to do that which it was prohibited from doing – litigating its case without paying its taxes.

Importantly, in suggesting the lower court could have proceeded with the trial despite the suspension of Color-Vue, the appellate court in *Color-Vue* had the benefit of hindsight and knew that Color-Vue was able to revive within two weeks. Moreover, even at the time Color-Vue sought a continuance before the trial court, it appeared to understand the terms of its suspension and demonstrated a willingness and ability to cure. In contrast, FRT reported it did not know *why* it was suspended and its counsel stated that a "host and a litany of issues" had surfaced, giving no assurance to the Court that it *could* or *would* revive its status prior to judgment. Continuing to trial while FRT was in suspended status presented a potential waste of substantial public and private resources, which would have far eclipsed the jury costs and attorneys' fees presently at issue. Finally, the dictum in *Color-Vue* regarding the trial court's ability to permit a suspended corporation to proceed to trial flies in the face of the plain language of the California Revenue and Taxation Code and actually incentivizes non-compliance. Thus, the persuasive value of *Color-Vue* is largely diminished.

**3.     National Did Not Waive the Right to Assert FRT's Lack of Capacity**

FRT argues that, because National raised this issue on the day of trial, it is untimely and the issue has been waived. FRT maintains that, "[w]hen the suspension occurs after the time to demur or answer has passed, defendant's only remedy is to move the court for leave to file an amended answer asserting the plea."

Assuming National had actually sought dismissal of FRT's claims, National did not waive its right to assert this defense. The *Color-Vue* court stated in a footnote that where the suspension occurs after the time to demur or answer, the respondents should have moved the court for leave to

file an amended answer asserting the plea. *Color-Vue*, 44 Cal. App. 4th at 1604 n. 5. Setting aside the procedural issue of whether National would have been required to amend its answer to file a motion to dismiss for lack of capacity, there is no evidence that National waived its right to assert the defense through undue delay.[4]

The *Color-Vue* court held that lack of capacity must be raised as soon as it becomes known – which is not necessarily at the pleading stage. *Id.* at 1604 (lack of capacity to sue "must be raised by defendant at the earliest opportunity or it is waived" (internal citation and quotation marks omitted)). In *Color-Vue*, there was evidence that Abrams and Leonard *knew* of Color-Vue's suspended status approximately 6 weeks prior to trial and never once raised the issue, despite being directed to declare all defenses they would raise at trial in the pretrial report. Although Color-Vue had been suspended for years prior to the trial, the unnecessary delay was not in failing to *discover* the suspension during the litigation; the delay was measured from the date of discovery to the date the issue was raised with the court. *Id.* Abrams and Leonard knew as early as March 21, 1994, of the suspension but chose to wait until May 11, 1994, to file a motion to dismiss, which the court deemed was undue delay and they had thus waived the issue. National's counsel, Mr. Hager, states he became aware of FRT's status the evening before trial, and raised it immediately the next day. (Doc. 334-1, Hager Declaration, ¶¶ 4-5.)

Although FRT expresses doubt that National only became aware of FRT's status the night before trial, there is simply no evidence suggesting that National had reason to know that FRT was suspended at an earlier time. National is under no obligation to continuously monitor the Secretary of State's website to ascertain from moment to moment whether FRT has maintained its active status. There is no undue delay.

Finally, the issue of waiver was rendered moot by the continuance granted to FRT and its subsequent revival – no basis remained to dismiss FRT's claims for lack of capacity. And, as discussed above, National was not prohibited from informing the Court of FRT's status, which was entirely proper, if not required.

---

[4] Had National actually sought dismissal of the case, it may have been appropriate for National to amend its pleadings. The Court makes no finding in this regard because the issue is moot.

**C.      Jury Costs and National's Fees and Expenses Shall be Imposed on FRT**

Cutting through FRT's arguments regarding legal capacity and waiver, the heart of the issue is a Rule 16 case-management problem:  FRT, due to its own lack of diligence, was not ready for trial on the date set by the Court.  Fed. R. Civ. P. 16.  No one other than FRT is responsible for its inability to proceed to trial due to its corporate status, and none of FRT's arguments persuade the Court differently.  Rule 16(f) empowers the Court to sanction a party who fails to comply with a scheduling order.  The rule provides that the court may, on motion or on its own, issue any just orders if a party or an attorney fails to obey a scheduling or other pretrial order.  Fed. R. Civ. P. 16(f)(1)(C).  "Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses – including attorney's fees – incurred because of any noncompliance with this rule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 16(f)(2).

Under Rule 16(f), courts have "very broad discretion to use sanctions where necessary to insure not only that lawyers and parties refrain from contumacious behavior, already punishable under the various other rules and statutes, but that they fulfill their high duty to insure the expeditious and sound management of the preparation of cases for trial." *In re Matter of Sanction of Baker*, 744 F.2d 1438, 1440 (10th Cir. 1984) (en banc); *see also* Fed. R. Civ. P. 16(f) advisory committee notes, 1993 Amendment Discussion ("[E]xplicit reference to sanctions reinforces the rule's intention to encourage forceful judicial management.")  Rule 16 was designed not only to maintain expeditious and sound management of the preparation of cases for trial but to deter conduct that unnecessarily consumes "the Court's time and resources that could have been more productively utilized by litigants willing to follow the Court's procedures." *Mulkey v. Meridian Oil, Inc.*, 143 F.R.D. 257, 262 (W.D. Okla. 1992).

Sanctions may be imposed for a party's unexcused failure to comply with a Rule 16 order, even if that failure was not made in bad faith. *See Ayers v. City of Richmond*, 895 F.2d 1267, 1270 (9th Cir. 1990) (affirming sanction of lawyer for failure to attend settlement conference because "the date 'slipped by him'"); *Ikerd v. Lacy*, 852 F.2d 1256, 1258-59 (10th Cir. 1988) ("Neither contumacious attitude nor chronic failure is a necessary threshold to the imposition of sanctions.");

*Harrell v. United States*, 117 F.R.D. 86, 88 (E.D.N.C. 1987) ("Improper motive, bad-faith, even reckless behavior, is not a prerequisite for finding a violation of [a] Rule [16 order])").

Here, FRT was legally prohibited, pursuant to California Revenue and Taxation Code § 23301, from proceeding to trial as set by court order issued on November 15, 2013. (Doc. 316.) Of all the participants in this litigation, *FRT was in the best position to know its status with the California Secretary of State and, in particular, its tax liabilities to the Franchise Tax Board*. The Franchise Tax Board is statutorily required to provide notice to corporations 60 days prior to suspending corporate status due to unpaid taxes. Cal. Rev. & Tax. Code § 21020. While Mr. Barbis maintains he received no notice from the Secretary of State regarding FRT's suspension "*since* April 2014," this is not a statement that he received *no* notice of FRT's impending suspension or a notice from the Franchise Tax Board that FRT was delinquent in paying its taxes. (Doc. 333-1, Milton Barbis Statement ("Barbis Statement"), ¶¶ 6-7.) Additionally, Mr. Barbis' August 5, 2014, statement that he had no notice at any time prior to May 28, 2014, of FRT's suspended status is conspicuously lacking a signature and is also not sworn under penalty of perjury. In other words, this statement is not a declaration, and the Court affords it no weight.

Furthermore, while the Court is not persuaded that Mr. Barbis had no notice of FRT's suspension, his *actual* knowledge of the suspension prior to trial is irrelevant to FRT's lack of diligence. Plaintiffs knew of the need to maintain their corporate status for purposes of this case, as the issue of corporate status had been raised in May 2012 with respect to Plaintiff Zone Sports Center, LLC ("Zone").[5] The information regarding FRT's suspended status was publicly available on the California Secretary of State's webpage months prior to trial. It was FRT's obligation to monitor and maintain its corporate status so it would be ready for trial on the scheduled date. And, nothing in *Color-Vue* persuades the Court that FRT's failure to comply with the November

---

[5] Zone was suspended by the California Secretary of State for failure to pay taxes in November 2011. On May 2, 2012, National sought dismissal of Zone due to its suspended status. (Doc. 34.) Zone filed a Certificate of Revivor dated May 9, 2012 (Doc. 42-1), and the Court denied National's motion. Additionally, in deposition testimony given by Mr. Barbis in a separate but related matter where Mr. Barbis was acting on behalf of FRT as its managing member, Mr. Barbis was asked if there was a reason he kept FRT active with the Secretary of State as a corporation. Mr. Barbis responded that he believed he needed to do so for the lawsuit. (*Fresno Rock Taco, LLC v. Rodriquez*, No. 1:11-cv-00622-SKO (E.D. Cal.), Doc. 55-23, p. 5, October 1, 2012, Deposition of Milton Barbis in the Matter of *Fresno Rock Taco, LLC v. Rodriquez*, 1:11-cv-00622-SKO) (E.D. Cal.).)

1  2013 trial-setting order in this case should be overlooked or is somehow attributable to National.
2  It is also noteworthy that FRT was the *only* participant in this litigation who could cure any issue
3  with respect to its status or unpaid taxes, and thus it was FRT's obligation to keep itself informed
4  of its own corporate standing with the California Secretary of State and to pay its taxes to the
5  Franchise Tax Board.  FRT's contention that it was somehow incumbent upon National to police
6  FRT's corporate status and FRT's ability to proceed to trial on May 28, 2014, is simply untenable.

7  Under the circumstances of this case, it is wholly inappropriate for the public fisc or the
8  judiciary to bear the cost of FRT's failure to comply with California's Revenue and Taxation Code,
9  monitor its corporate status with the Secretary of State, or to diligently appear for trial on May 28,
10 2014, ready and legally able to proceed.  By absorbing the costs associated with FRT's lack of
11 diligence in monitoring and maintaining its corporate status which led to last-minute attempts at
12 corporate revival necessitating trial continuance, the public, National, and the Court would be
13 penalized for FRT's lack of diligence.

14 National did nothing improper by informing the Court, at the earliest possible time after
15 becoming aware of the issue, that FRT was suspended and was prohibited by statute from
16 proceeding in the litigation in that posture.  There is no basis to allocate to National a portion of
17 the costs of the jury fees.  *Color-Vue* is especially distinguishable in this regard as there is no
18 evidence that National knew, but withheld the information regarding FRT's status, until the last
19 possible moment as in *Color-Vue*.  And while FRT's lack of capacity did not undercut the Court's
20 jurisdiction and FRT was not required to *prove* its active status as an element of its claims, it was
21 still required to revive its status.

22 In sum, because FRT failed to diligently pay its taxes and monitor its corporate status, it
23 required a continuance to attempt revival on the first day of trial.  This last-minute continuance
24 entailed dismissing a jury that had already been summoned and incurring unnecessary costs.
25 FRT's responsibility for the jury costs is an entirely warranted sanction pursuant to Rule 16(f).
26 ///
27 ///
28

13

**C.   National's Attorneys' Fees and Expenses Incurred As a Result of Continuance Must be Paid by FRT**

National requests that FRT be ordered to pay National its attorneys' fees and expenses incurred as a result of the continuance of the trial. National maintains it has incurred $11,549.27 as a result of the last-minute continuance. Specifically, National's counsel bills at $250 per hour for Mr. Cooney's time and $325 per hour for Mr. Hager's time. National seeks $2,600 for counsel's eight hours of travel time to Fresno for trial, billed at half the normal hourly rate. National also seeks $6,900 for 12 hours each spent by Mr. Cooney and Mr. Hager in preparation for trial. National requests $724.27 for hotel accommodations incurred. Mr. Hager spent an additional five hours preparing a response to FRT's June 27, 2014, status update after the trial was continued, for which National was billed $1,625. The total cost of the continuance to National was $11,549.27.

National's attorneys' fees and expenses are an appropriate sanction for FRT's inability, through its own lack of diligence, to comply with the November 15, 2013, order setting trial for May 28, 2014. Considering National's counsel's hourly rates and the number of hours the continuance caused National to expend unnecessarily, both counsel's hourly rates and the number of hours expended are reasonable. Thus, National shall be awarded $11,549.27 in attorneys' fees and expenses as a sanction for FRT's inability to proceed to trial on May 28, 2014.

## IV.   CONCLUSION AND ORDER

For these reasons, the Court ORDERS that:

1.   Within thirty (30) days from the date of this order, Fresno Rock Taco LLC shall pay to the Court jury costs in the amount of $5,513.16; and

2.   Within thirty (30) days from the date of this order, Fresno Rock Taco shall pay to National attorneys' fees and expenses in the amount of $11,549.27.

IT IS SO ORDERED.

Dated:   **September 2, 2014**          **/s/ Sheila K. Oberto**
                                         UNITED STATES MAGISTRATE JUDGE