1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

7

### EASTERN DISTRICT OF CALIFORNIA

8

9   FRESNO ROCK TACO, LLC, and ZONE          Case No.  1:11-cv-845-SKO
    SPORTS CENTER, LLC
10                                            **ORDER DENYING DEFENDANT'S**
                    Plaintiffs,              **MOTION TO ALTER OR AMEND THE**
11                                            **JUDGMENT**
            v.
12                                            **(Doc. 375)**

13                                            **ORDER GRANTING IN PART AND**
    NATIONAL SURETY INSURANCE                **DENYING IN PART PLAINTIFFS'**
14  CORPORATION,                             **MOTION TO AMEND THE JUDGMENT**
                                             **TO INCLUDE PREJUDGMENT AND**
15                                            **POST-JUDGMENT INTEREST**

16                  Defendant.               **(Doc. 376)**

17  _____/

18

19                          **I.    INTRODUCTION**

20          Following a jury trial, on August 22, 2014, the jury returned a verdict in favor of Plaintiffs

21  and awarded damages to Fresno Rock Taco, LLC ("FRT") in the amount of $2,224,349.00 and to

22  Zone Sports Center, LLC ("Zone") in the amount of $274,823.00.  (Doc. 364.)  Judgment was

23  entered against Defendant National Surety Insurance Corporation ("National" or "Defendant") on

24  August 25, 2014.  (Doc. 368.)

25          On September 22, 2014, Plaintiffs filed a motion to amend the judgment to include

26  prejudgment and post-judgment interest.  (Doc. 376.)  National filed a motion to amend the

27  judgment.  (Doc. 375.)  A hearing was held on both motions on November 18, 2014.  (Doc. 391.)

28

For the reasons set forth below, National's motion to amend the judgment is DENIED; Plaintiffs' motion to amend the judgment is GRANTED in part and DENIED in part.

## II.   BACKGROUND[1]

### A.   Factual Background

Plaintiffs are each California limited liability companies.  Zone is a real estate developer that owned a Fresno commercial real estate project that did business as Village at Granite Park ("Granite Park").  FRT operated a restaurant/nightclub as a property lessee in Granite Park that did business as Cabo Wabo Cantina and Memphis Blues.  Milton Barbis ("Barbis") is FRT's sole and managing member, and he is also the managing member of Zone.

In December 2006, FRT entered into an agreement with Red Head, Inc. ("RHI"), a corporation that markets and licenses the intellectual property created by rock musician Sammy Hagar for use in connection with restaurants, nightclubs, and merchandise, to develop a Cabo Wabo Cantina (the "Cantina").[2]  (*Zone Sports Center, LLC, et al., v. Red Head, Inc., et al.* ("*Zone*"), 1:10-cv-1833-AWI (E.D. Cal. Oct. 2010), Doc. 1, ¶ 19.)[3]  FRT then executed a lease with Zone for the premises where the Cantina was to be located in Granite Park, and Zone began construction on a building for FRT's Cantina restaurant/nightclub.  (Zone, 1:10-cv-1833-AWI, Doc. 1, ¶¶ 19, 30, 31.)  During the August 2014 trial, Barbis testified[4] that he purchased the sound equipment for the Cantina from Paul Binder at California Music Express.  According to Barbis, Binder was the sound person through whom Hagar insisted Barbis purchase the sound equipment. Barbis stated the cost of the sound equipment was approximately $414,000, which included labor

---

[1] The background summary was assembled in part through reference to the August 2014 trial testimony.  Citations to trial testimony are drawn from unofficial transcripts, as official transcripts of the trial have not been requested by either party in full.  As the official transcript will be paginated differently, no page numbers or lines of testimony drawn from the unofficial transcripts shall be referenced.  The Court's background summary is not meant to be binding or dispositive of any issue.

[2] The name of the Cantina was changed to Memphis Blues in December 2008.  For ease of reference, the building will be referred to in this order as the Cantina.

[3] This case was transferred from this Court to the Northern District of California on February 7, 2011, and was assigned case number 3:11-cv-00634-JST.  The complaint was amended several times while the action was pending before the Northern District.

[4] Unofficial Trial Transcript, Aug. 13, 2014, Testimony of Milton Barbis.

1   for the installation.  Ultimately, the sound equipment installation was completed, and the Cantina

2   opened for business on August 28, 2008.  (*Zone*, 1:10-cv-1833-AWI, Doc. 1, ¶ 58.)

3          Disputes, however, arose between FRT and RHI regarding the scope and nature of their

4   agreement, and Barbis testified within a month of opening the Cantina, his relationship with Hagar

5   had soured and Barbis believed their agreement was not working out.  According to Barbis,

6   although Barbis had been working on a plan to remodel the Cantina since September 2008, the

7   agreement with Hagar and RHI was terminated on December 12, 2008.  The remodel was roughly

8   estimated to occur between September 2008 and March 2009.  In December 2008, after the split

9   with Hagar, Barbis claimed the club stopped functioning as the Cabo Wabo Cantina and the

10  remodel construction commenced during the weekdays.  Barbis stated the plan was to close the

11  club for the duration of the remodel after preexisting commitments were completed in December.

12  To meet the existing commitments, however, the club opened for just a few weeks in December as

13  Memphis Blues and then closed entirely to complete the remodel.[5]

14         At some point prior to December 2008, Binder and Barbis began to dispute the amount

15  owed by FRT for the audio/visual/lighting equipment.  In an effort to collect what he claimed FRT

16  still owed for the audio/visual/lighting equipment and its installation, Binder testified he

17  repossessed some of the equipment with Barbis' knowledge on December 17, 2008.[6]  Binder

18  testified that after a conversation with Barbis, Howard Young, and John Benjamin – each a

19  member of various LLCs that held interests in Granite Park[7] – Binder concluded that he could

20  remove certain equipment without interrupting the business operations and credit the outstanding

21  amount owed by FRT.  According to Binder, equipment was then removed from the restaurant

22  with Barbis' knowledge, and he sent an email to Barbis, Young, and Benjamin summarizing what

23  he had taken from the restaurant and the new balance owed by FRT.  Binder testified that on

24  December 19 or 21, 2008, he returned to the Cantina to reclaim some Hagar merchandise, but did

25

26  [5] Unofficial Trial Transcript, Aug. 13, 2014 (Day 5), Testimony of Milton Barbis.

27  [6] Unofficial Trial Transcript, Aug. 12, 2014 (Day 4), Testimony of Paul Binder.

28  [7] Howard Young testified that he partnered with John Benjamin and Barbis to develop Granite Park.  Unofficial
    Transcript, August 13, 2014 (Day 5), Testimony of Howard Young.

1   not remove any sound or lighting equipment from the club.  According to Binder, Barbis was not

2   present when Binder returned to the Cantina to reclaim the Hagar merchandise.  Barbis testified he

3   authorized Binder to take four lights at the time of Binder's first visit to the Cantina, but he had no

4   knowledge that Binder had taken anything beyond those four lights.

5        At the end of January 2009, while the club was closed for remodeling, Barbis testified he

6   became aware of a theft at the Cantina after receiving a call from an employee.  Barbis travelled to

7   the site and noticed the exterior copper doors of the building were damaged and in the interior of

8   the building, wires were hanging down from the walls and tables had been moved around.  Barbis

9   claimed he called his insurance agent at Defendis and Dibudio ("D&D"), Chris Gutilla.  At some

10  point the police were contacted regarding the theft, and on February 5, 2009, a community service

11  officer was sent to investigate a report of theft at the club.[8]  A person from D&D contacted

12  National to report the theft on February 17, 2009.[9]

13       After this alleged theft was reported to National, the claim was assigned to Roger Suelzle,

14  a field adjuster at National.[10]  Suelzle testified that in late February 2009, he told Barbis that he

15  would come to the site for an inspection and asked Barbis to prepare an inventory list of the items

16  he claimed had been stolen.[11]  Suelzle testified he sent Barbis a partially-completed proof of loss

17  statement to fill out and return.  On March 31, 2009, Barbis returned the proof of loss, apparently

18  on behalf of both FRT and Zone, itemizing the damage to the building itself as well as the stolen

19  equipment.  The proof of loss included a list of equipment FRT claimed was stolen.  On May 11,

20  2009, National opened a second claim under Zone's policy for damage reported to the copper

21  doors of the building.  (Doc. 111, 8:8-9.)

22       John Auvenin was the program manager for the western region of National's Special

23  Investigations Unit ("SIU") at the time of FRT and Zone's claim to National.[12]   Prior to

24  _____

[8] Unofficial Trial Transcript, August 13, 2014 (Day 5), Testimony of Michael Buchbinder.

25  [9] Unofficial Trial Transcript, August 11, 2014 (Day 3), Testimony of Roger Suelzle.

26  [10] Unofficial Trial Transcript, August 11, 2014 (Day 3), Testimony of John Auvenin.

27  [11] Unofficial Trial Transcript, August 11, 2014 (Day 3), Testimony of Roger Suelzle.

28  [12] Unofficial Trial Transcript, August 11, 2014 (Day 3), Testimony of John Auvenin.

notification from Suezle about the theft claim, in March 2009, Auvenin received a call from Benjamin Rodriquez, a detective with the California Department of Insurance ("DOI"), fraud unit.[13]  Auvenin testified Rodriquez informed him the Fresno Police Department and the DOI were investigating a suspicious claim involving property at Granite Park.[14]

After this call from DOI, Suelzle referred Plaintiffs' claim to Auvenin.[15]  Auvenin testified there were numerous red flags, or suspicious indicators, related to the claim.[16]  According to Auvenin, although there was evidence of Binder's repossession of property in December 2008, some of the repossessed property was apparently included in FRT's claim.  Auvenin testified he assigned an outside company to perform field investigations, which included two interviews of Paul Binder and the persons who assisted FRT and Zone in preparing the loss inventory they submitted to National.  Meanwhile, Suelzle testified that due to the DOI investigation of FRT and Barbis and the referral of the claim to National's SIU division, he was told to go no further in his investigation of the claim.  Accordingly, other than driving by the site in November 2009, Suelzle did not investigate the interior of the club.[17]

In May 2009, the DOI raided the Barbis home, the Cantina, and other properties as part of a criminal insurance fraud investigation.  Due to apparent discrepancies with the claim, National sought an examination under oath ("EUO") of Barbis, which took place on October 29, 2009. (Doc. 111, 8:13-20.)   Between October and December 2009, National conducted a follow-up investigation regarding Barbis' EUO testimony, including re-interviewing Binder through National's third-party investigator as well as interviewing a contractor who provided an estimate to repair the copper doors on the outside of the Cantina.  (Doc. 111, 8:11-27.)

---

[13] Unofficial Trial Transcript, August 11, 2014 (Day 3), Testimony of John Auvenin (cross-examination).

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] Unofficial Trial Transcript, August 11, 2014 (Day 3), Testimony of Roger Suelzle.

1    On February 4, 2010, National denied FRT and Zone's claim, disclaiming coverage for the

2   equipment and the damage to the copper doors.  National's primary basis for denial of the claim

3   was that Plaintiffs had made material misrepresentations to National regarding the claim, therefore

4   voiding FRT and Zone's policies.  (Doc. 111, 9:1-4.)

5    Plaintiffs claimed that National's inadequate investigation and wrongful denial of the claim

6   damaged Plaintiffs in several respects.  First, National failed to pay for the property damage and

7   stolen equipment as required under Plaintiffs' policies.  Second, both FRT and Zone had business

8   interruption coverage under their policies, and  National failed to pay for the business interruption

9   the theft caused to both businesses as required under Plaintiffs' policies.  Finally, because National

10   wrongfully and unreasonably delayed denying their claim, FRT was unable to reopen the club and

11   the business failed.  FRT lost not only its profits from the restaurant, but lost all its tenant

12   improvements when it was forced to go out of business.  Zone, receiving rent from FRT, also

13   alleged economic loss in the form of property damage to the Cantina and lost rental income from

14   FRT.

15    Supporting Plaintiffs' theory of damage to FRT, Jim Mueller ("Mueller"), a former loan

16   officer for Temecula Valley Bank, testified Barbis approached him in mid-2007 seeking a business

17   loan which was approved; however, because of the franchise/licensing agreement issues between

18   FRT and RHI, the loan could not be closed.[18]  Mueller testified Barbis approached him again in

19   August or September 2008 for a different loan – approximately $1.2 million – for tenant

20   improvements FRT made in renovating the Cantina to convert it to Memphis Blues.  Mueller

21   testified this loan was approved, but never funded.  Mueller stated that for the money to be paid

22   under the terms of that loan, Memphis Blues had to be open and the borrower had to have no

23   outstanding claims or lawsuits.[19]  The loan, which was scheduled to close in January 2009, never

24   closed.  Mueller stated he became aware of the theft in late 2008 when Barbis told him that

25

26   [18] Unofficial Trial Transcript, August 13, 2014 (Day 5), Testimony of Jim Mueller.

27   [19] On cross examination by National, Mueller's deposition testimony was introduced as impeachment evidence.  In his
      deposition, Mueller was asked whether an outstanding insurance claim would directly affect whether a loan would
28   close to which Mueller responded "no."

6

1   equipment had been stolen from the Cantina during its renovation.  Mueller testified on cross-

2   examination that this prevented the loan from closing, and that had the equipment been replaced,

3   the loan would have been funded.[20]

4        Dr. Luna, Plaintiffs' damage expert, testified that at the time it shut down, FRT's club was

5   profitable.  Dr. Luna's calculation of damages was as follows:  FRT suffered $124,349 in stolen

6   property (Doc. 371, 45:25-46:2, *see also* Doc. 371, 49:2); FRT incurred $1,653,726 in

7   consequential damages for constructing the Cantina building, which was lost when the club failed

8   (Doc. 371, 46:13-20);  FRT's one-year of lost profits was $599,673 (Doc. 371, 49:22-23), and the

9   opportunity interest on the year of lost profits was $216,556 (Doc. 371, 51:24-25; 52:6-7); FRT

10  had $565,283 of continuing expenses for one year and opportunity interest of $204,137 (Doc. 371,

11  55:21-25); FRT's projected lost profits for five years were $3,707,151 and its opportunity interest

12  on the five-year profit loss  was $783,705; and the projected lost profits extending over the term of

13  its lease with Zone were $4,676,379[21] (Doc. 371, p. 47-52).

14       As to Zone, Dr. Luna testified it suffered $14,823 in property damage which was not paid

15  as a result of the wrongful denial of Zone's claim.  (Doc. 371, 58:11-14.)  As to consequential

16  damages, Dr. Luna testified that Zone charged FRT rent, which was not paid after FRT's club was

17  unable to reopen.  The lost rent for a 12-month period was $433,554, the five-year loss of rents

18  from FRT totaled $2,167,770, and the loss of rents through FRT's lease term was $3,303,194

19  (Doc. 371, 60:8-18).

20       Dr. Luna testified that the DOI raid on the properties at Granite Park resulted in FRT's

21  inability to get its liquor license and Zone's inability to refinance.  This resulted in the destruction

22  of the entire development, from an accounting standpoint.  (Doc. 371, 59:8-17.)  Dr. Luna also

23  testified that the consequential damages to Zone that arose out of the failure of the entire

24  development were $19,653,033.  (Doc. 371, 63:4-6.)

25

26

27  [20] Unofficial Trial Transcript, August 13, 2014 (Day 5), Testimony of Jim Mueller.

28  [21] Dr. Luna testified the present value of the lost profits for the full lease term was $5,809,745.

**B.      Procedural Background**

This case was initially set for trial in October 2013, but it was continued due to calendar conflicts of defense counsel (Doc. 176) and the district court (Doc. 178).   In the interim, the parties consented to magistrate judge jurisdiction, and the trial was reset for May 7, 2013, before U.S. Magistrate Judge Sheila K. Oberto.  The case proceeded to trial, but ended in a mistrial due to a hung verdict.  (Doc. 225.)

The re-trial was then set for July 31, 2013, which was continued due to a motion filed by National.  The motion was denied, and the re-trial was then set for May 28, 2014. On May 28, 2014, Plaintiffs were unable to begin trial as FRT's corporate status had been made inactive by the California Secretary of State due to non-payment of taxes.  (Doc. 332.)  The retrial was continued to August 6, 2014, which proceeded as scheduled.  Following presentation of the evidence, the jury returned a verdict on August 22, 2014, awarding contract damages of $2,224,349 to FRT and $274,823 to Zone.  (Doc. 364.)  Judgment was entered on August 25, 2014, and the parties timely filed motions to amend the judgment on September 22, 2014.  A hearing was held on the parties' motions on November 18, 2014.

**C.      FRT Litigation History and Judicial Estoppel**

**1.      *Red Head, Inc. v. Fresno Rock Taco, LLC*, 3:08-cv-5703-EMC (N.D. Cal. 2008)**

On December 22, 2008, RHI filed suit against FRT in the U.S. District Court for the Northern District of California, alleging FRT had breached their agreement by, among other things, failing to pay any royalties and refusing to provide books and records needed to perform audits required by the agreement.  (*Red Head, Inc. v. Fresno Rock Taco, LLC*, ("*Red Head*"), 3:08-cv-5703-EMC, Doc. 1, ¶ 1.)  During the course of that litigation, Milton Barbis filed a declaration stating that he was "the 100% owner of Fresno Rock Taco, LLC."  (Red Head, 3:08-cv-5703-EMC, Doc. 23 ¶ 1.)

On December 31, 2008, the court in *Red Head* issued a preliminary injunction effective during the pendency of the action precluding FRT from displaying any trademark or trade dress

1  that imitates or is confusingly similar to Cabo Wabo trademarks.  (Red Head, 3:08-cv-5703-EMC,

2  Doc. 36.)

3      In March 2009, the Red Head litigation between RHI and FRT was settled pursuant to a

4  confidential agreement; on March 20, 2009, a stipulated judgment was entered along with a

5  permanent injunction barring FRT and its agents from using or selling RHI's trademarks and other

6  intellectual property.  (*Red Head*, 3:08-cv-5703 EMC, Doc. 51.)

7      Meanwhile, the California Department of Insurance and the City of Fresno were

8  conducting an investigation of purported fraud related to several businesses located at the Granite

9  Park development, including FRT, Zone, and The Fine Irishman.[22]  (*See generally Fresno Rock*

10  *Taco, LLC et al.  v. Rodriquez, et al*. ("*Rodriquez*"), 1:11-cv-622-LJO-SKO, Doc. 9.)  As a result

11  of the investigation, on May 28, 2009, the business locations of FRT, Zone, and The Fine

12  Irishman, as well as the home of Milton Barbis, were searched by law enforcement pursuant to a

13  search warrant.  (*Rodriquez*, 1:11-cv-622-LJO-SKO, Doc. 9, ¶¶ 17-23.)

14

15      **2.      Milton and Heidi Barbises' Bankruptcy Proceedings and Subsequently Filed
             Civil Actions**

16

17      On October 30, 2009, Milton and Heidi Barbis filed a Chapter 7 bankruptcy petition.  (*In*

18  *re Milton Barbis*, CAEB, 1:09-bk-60548, Doc. 1.)  The petition listed the debtor as Milton Peter

19  Barbis, doing business as Granite Park Professional Center, LLC, Sphere Properties, LLC, Granite

20  Park Food and Beverage, Inc., Fresno Rock Taco, LLC, The Public House Fresno, LLC, JEG

21  Ventures, LLC, ECCO Food and Entertainment, LLC, The Zone Sports Center, LLC, and the

22  Brick Oven Investors, LLC.  Heidi Barbis was listed as the joint debtor.  (*In re Milton Barbis,*

23  1:09-bk-60548, Doc. 1.)

24      Schedule B of the bankruptcy petition indicates that Milton Barbis had a 25% interest in 9

25  separate companies, including FRT.  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 1.)  The value of

26  the Barbises' interest in the property, without deducting any secured claim or exemption, was

27

28  [22] The Fine Irishman was another business located in Granite Park of which John Benjamin was the sole owner. (*Rodriquez*, 1:11-cv-00622-LJO-SKO, Doc. 64, 5:17-19.)

listed as $0.  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 1.)  On line 21, the petition required the debtor to identify "other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims.  Give estimated value of each."  (I*n re Milton Barbis*, 1:09-bk-60548, Doc. 1.)  Line 21 of the Barbises' petition was marked "none."  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 1.)

On February 4, 2010, the bankruptcy court issued a "Discharge of Debtor" order.  (I*n Re Milton Barbis*, 1:09-bk-609548, Doc. 15.)  On that same day, National issued a letter to FRT and Zone denying their claims for insurance coverage.  (Doc. 25, ¶ 26.)  Following the February 4, 2010, bankruptcy discharge order, the Barbises filed several motions to avoid liens of various creditors; the bankruptcy case was formally closed on September 21, 2010, following the issuance of a final decree.  (*In re Milton Barbi*s, 1:09-bk-60548, Docs. 16, 29, 42.)

On October 4, 2010, Zone, FRT, and Milton Barbis as an individual filed suit against RHI, Sammy Hagar, and others and alleged federal and state law claims arising out of the 2006 agreement between RHI and FRT (the "*Zone*" litigation).  (*Zone*, 1:10-cv-01833-AWI, Doc. 1).

On October 20, 2010, the Bankruptcy Trustee ("Trustee") overseeing the Barbises' bankruptcy proceeding, motioned the bankruptcy court to reopen the bankruptcy case, indicating that he was informed and believed that the debtors failed to disclose in their bankruptcy schedules Milton Barbis' interest, as plaintiff, in a multi-million dollar lawsuit pending in the United States District Court, Eastern District of California.  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 44.)  The bankruptcy case was reopened, and the Barbises filed a motion for reconsideration.  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 48.)  The Barbises asserted that the case the Trustee cited was filed on October 4, 2010, and was not known to the Barbises when they filed their petition on October 30, 2009.  At the time their petition was filed, they believed the settlement agreement between RHI and FRT precluded further claims against RHI.  (*In re Milton Barbis*, 1:09-bk-60548, Docs. 48-50.)  The Barbises' motion for reconsideration was denied.  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 54).

On February 7, 2011, the *Zone* litigation was transferred to the Northern District of California as it retained continuing jurisdiction arising out of the original 2008 *Red Head* action.

(*Zone*, 1:10-cv-01833-AWI, Doc. 39.)  On April 16, 2011, Milton and Heidi Barbis, their minor daughter Claire Barbis, Zone, FRT, and The Fine Irishman, LLC ("TFI"), filed suit in the U.S. District Court for the Eastern District of California against the City of Fresno, Detective Rhames, and Detective Rodriguez alleging constitutional violations arising out of the searches conducted on May 28, 2009, at the Zone, FRT, and TFI business locations and the Barbises' residence (the "Rodriquez" litigation).  (*Rodriquez*, 1:11-cv-00622-LJO-SKO, Doc. 1.)  On April 20, 2011, FRT and Zone filed the instant lawsuit against National asserting breach of contract and bad-faith denial of an insurance claim, arising out of the January/February 2009 theft at the Cantina restaurant/club location (the "*National*" litigation).

On June 6, 2011, the Barbises' bankruptcy case was closed, while the three separate civil litigations (*Zone, Rodriquez,* and *National*) proceeded.  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 79.)  On June 30, 2011, the defendants in the *Rodriquez* case filed motions to dismiss asserting, among other things, that Milton and Heidi Barbis as individuals as well as each of the limited liability corporations ("LLCs"), should be judicially estopped from pursuing their claims due to the Barbises' failure to disclose the claims in their bankruptcy petition.  The *Rodriquez* plaintiffs (Milton and Heidi Barbis, their minor daughter Claire Barbis, Zone, FRT, and TFI) responded that the Trustee had examined the *Rodriquez* claims and had determined, for bankruptcy estate purposes, the claims had no value and had been abandoned, resulting in the claims re-vesting to the plaintiffs.  The *Rodriquez* plaintiffs also argued that they were not aware of their potential claims until after they filed bankruptcy petitions.  Additionally, the plaintiffs maintained that, since the LLCs never declared bankruptcy, the LLCs had standing to assert their claims.

On August 9, 2011, the district court determined that the Trustee had abandoned the plaintiffs' claims in the *Rodriquez* action, and all of the plaintiffs therefore had standing to pursue their claims.  Further, judicial estoppel was not applicable because the Bankruptcy Court relied on the Trustee's decision to abandon the claims, not on the plaintiffs' initial assertion that there were no claims.  (*Rodriquez*, 1:11-cv-00622-OWW, Doc. 17, 5:25-11:25.)

On August 31, 2011,[23] *Rodriquez* defendants City of Fresno and Rhames filed a motion for reconsideration of the August 9, 2011, order denying their motion to dismiss.  (*Rodriquez*, 1:11-cv-00622-LJO-SKO, Doc. 24.)  The *Rodriquez* defendants asserted that the court had been misled by misrepresentations of the plaintiffs' counsel about which claims had actually been disclosed to the Trustee and abandoned.

While that motion for reconsideration was pending, the *Zone* defendants sought to dismiss the plaintiffs' claims, asserting that judicial estoppel precluded the plaintiffs from bringing their claims because Barbis had failed to disclose the claims in the Barbises' bankruptcy proceeding.  (*Zone*, 3:11-cv-634-JSW, Docs. 14, 16, 56.)  In a September 1, 2011, order, the court found that the Barbises' bankruptcy case had been reopened and the Trustee was given an opportunity to administer the unscheduled claims.  As such, the court determined that Mr. Barbis' inconsistent positions were remedied and he was not judicially estopped from litigating his claims in the *Zone* case.  (*Zone*, 11-cv-634-JSW, Doc. 86; *see also* 2011 WL 3862007, at *3 (N.D. Cal. Sept. 1, 2011).)

On November 1, 2011, the *Rodriquez* Court granted in part and denied in part the defendants' motion for reconsideration.  (*Rodriquez*, 1:11-cv-00622-LJO-SKO, Doc. 35.)  The Court concluded that notwithstanding whether the Trustee had actually abandoned the claims that were the subject of the *Rodriquez* action rather than the *Zone* action, the claims were never properly disclosed to the creditors, and thus could not be deemed abandoned.  Milton and Heidi Barbis' claims were barred by judicial estoppel and dismissed from the suit.  The court then addressed the standing of the LLCs (FRT, Zone, and TFI) to assert their claims in *Rodriquez*:

> One issue remains.  Only Milton and Heidi Barbis filed for bankruptcy. Defendants argue that, like Milton and Heidi Barbis, Fresno Rock Taco, LLC, Zone Sports Center, LLC, and the Fine Irishman, LLC (the "LLC Plaintiffs") should be judicially estopped from bringing the present claims in this Court.  *See* Doc. 15 at 5-6.  The Bankruptcy Docket indicates Milton Barbis was "doing business as" all three LLC Plaintiffs.  *See* 1:09-bk-60548 Docket.  In addition, Plaintiffs admit that the Barbis' bankruptcy petition listed the three LLC Plaintiffs as assets of the estate with "No Cash Value."  Doc. 13 at 5.  Although Milton and Heidi Barbis would arguably be judicially estopped from asserting claims on behalf of the LLC

---

[23] The City of Fresno and Detective Rhames filed an ex parte motion for reconsideration on August 9, 2011, which was refiled as a regularly noticed motion on August 31, 2011.

1    Plaintiffs because the Barbis[es] failed to amend their own bankruptcy schedules to
2    indicate that the LLC Plaintiffs possessed a potentially valuable asset (the claims in
     this case), Defendants provide no legal authority to support an extension of judicial
3    estoppels to the LLC Plaintiffs themselves.  According to their bankruptcy petition,
     *see* 1:09-bk-60548 Doc. 1 at Schedule B, Milton and Heidi Barbis control only
4    25% of the stock in each of these LLCs.  (Presumably, others hold the remaining
5    75% interest).  The LLCs, which arguably have independent standing to bring
     Section 1983 civil rights claims, *see Club Retro, LLC v. Hilton*, 568 F.3d 181, 196
6    (5th Cir. 2009), themselves made no representations in the bankruptcy court and
     therefore are not *per se* judicially estopped from bringing the claims in this case by
7    virtue of Milton and Heidi Barbis' conduct.  This ruling is without prejudice to a
     Federal Rule of Civil Procedure 56 challenge to the LLCs' standing based on a
8    more complete record.

9    (*Rodriguez*, 1:11-cv-00622-LJO-SKO,[24] Doc. 35, 10:12-11:5.)

10       Less than two weeks later, on November 11, 2011, the Barbises filed a motion to reopen

11   their bankruptcy case.  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 80.)  They acknowledged that

12   they failed to disclose in their bankruptcy schedules their interest as plaintiffs in the *Rodriquez*

13   action.  As a result of the Barbises' motion, the bankruptcy case was reopened on November 18,

14   2011.  (*In re Milton Barbis*, 1:09-bk-60548 Doc. 82.)

15       On February 10, 2012, the Trustee submitted a motion to compromise the Barbises' claims

16   in the *Rodriquez* action.  (*In re Milton Barbis*, 1:09-bk-60548 Doc. 95.)  In relevant part, the

17   Trustee submitted the following statement:

18       5.    Trustee, the City of Fresno (obo Brendan Rhames), and the State of
     California (obo Ben Rodriquez) are desirous of resolving the controversy without
19   resorting to a lengthy and costly court proceeding as to the alleged claims of the
     debtor; and, as such, the City of Fresno has offered $10,000 and the State of
20   California has offered the sum of $10,000 to settle all claims of the debtors (held in
     their name directly) and to settle all claims of the debtors held (indirectly) through
21   entities of the debtors (namely Fresno Rock Taco, LLC; Zone Sports Center, LLC;
     and, The Fine Irishman, LLC).
22
     6.    As to interests held indirectly the estate makes no warranties;
23   however, any interest (if any) of the debtors in these causes of action held by those
     entities, as against the settling parties, are being transferred/settled through this
24   compromise.

25   (*In re Milton Barbis*, 1:09-bk-60548, Doc. 95, ¶¶ 5-6.)
26

27   _____

28   [24] *Rodriquez* was reassigned to U.S. District Judge O'Neill following the retirement of Senior District Judge Oliver W.
     Wanger.

1    On February 29, 2012, the Barbises filed an objection to the Trustee's motion to

2  compromise their claims in *Rodriquez*, asserting that the actual value of the claims was much

3  higher than the $20,000 settlement amount, and therefore settlement was not in the best interest of

4  the estate.  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 101.)  The Barbises also objected that the

5  Trustee's motion was seeking to settle the claims not only as to the debtors, but also as to all of the

6  entities owned by the debtor.  The Barbises argued that the Trustee had no authority to settle the

7  claims on behalf of the entity LLCs.

8    On March 5, 2012, the City of Fresno (the "City") filed a statement in support of the

9  Trustee's motion to compromise.  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 105.)  In response to

10  the Barbises' assertion that the Trustee was attempting to settle the claims of the plaintiff LLC

11  entities in *Rodriquez*, the City maintained that the only interests of the LLC entities being settled

12  were those portions of the LLCs owned by the debtors.  The City noted that, to the extent some

13  other individual or entity had some interest in the LLCs, "those LLCs remain[ed] viable parties to

14  the surviving portions of the underlying lawsuit."  (*Id*., Doc. 105, 6:19-7:9.)

15    On March 8, 2012, the Trustee filed a reply to the Barbises' objections indicating that the

16  Barbises' assertion regarding the sale of claims by entities owned by the debtor misstated the

17  subject of the compromise.  (*Id.*, Doc. 106.)  The Trustee maintained that paragraph 6 of his

18  motion (*see id*., Doc. 95 ¶ 6) stated that no warranties were being made as to the indirect

19  ownership interests being sold.

20    On March 15, 2012, the bankruptcy court issued an order approving the settlement of the

21  claims in the *Rodriquez* case:

22    After reviewing the Motion, the file, and the evidence presented, the Court hereby
      . . . ORDERS, ADJUDGES AND DECREES that the settlement of the controversy
23    in the civil suit, known as USCD Case No. 1:11-cv-0622 OWW SKO in the
      Eastern District of California, and the above-referenced debtors estate, is hereby
24    approved under the terms and conditions set forth in the Trustee's Motion for Order
      Approving Compromise of Controversy.  Settlement is as to the complete interest
25    of the debtors in the above noted suit and the estate's interest, if any, in the suit as
      held by the other named plaintiffs in which the bankruptcy estate owns an
26    ownership interest as of this date.

27

28  (*In re Milton Barbis*, 1:09-bk-60548, Doc. 109, 1:19-2:4.)

On May 2, 2012, National filed a similar motion in this case asserting that Zone and FRT were judicially estopped from asserting their claims against National due to Milton Barbis' failure to list FRT and Zone's tendered insurance claim on his bankruptcy petition.  (Docs. 34, 35.)  Zone and FRT responded that neither of their debts had been discharged in bankruptcy, nor were they the alter egos of Barbis.  Zone and FRT maintained that, if they prevailed in their action against National, the proceeds would be subject to outstanding judgments against Zone and FRT as well as subject to other debts of Zone and FRT; in sum, Barbis would receive none of the proceeds of this action if Zone and FRT prevailed.  (Doc. 41.)  Additionally, Zone and FRT noted that Zone is not wholly owned by Barbis, and although Barbis is FRT's sole member, there were other investors in FRT.  (Doc. 41.)

On May 25, 2012, the Court denied National's motion stating the following:

> [National] fails to establish application of judicial estoppel to plaintiffs.  [National] provides no authority to support that Mr. Barbis' chapter 7 bankruptcy representations judicially estop the claims of plaintiffs, corporate entities in which Mr. Barbis has limited interests.   [National] relies on authorities involving a debtor's claims, not claims of corporate entities separate from the debtor.  Mr. Barbis is the bankruptcy debtor, not plaintiffs.  Mr. Barbis' purported knowledge of claims would be relevant if he pursued them as plaintiff.  He does not.  Plaintiffs are not subject to judicial estoppel because any position asserted in Mr. Barbis' bankruptcy is imputed to him and is not inconsistent with plaintiffs' positions in this action.

(Doc. 48, 9:3-9.)

On September 5, 2012, National filed a "Notice of Related Case" in this case and in the *Rodriquez* case.  (Doc. 117.)  National stated that FRT and Zone were seeking the same damages for lost earnings in each case, and that "[h]aving separate trials would result in a duplication of effort and [would result in a waste of] judicial resources."  (Doc. 117, 2:2-3.)  On September 7, 2012, the Court issued an order relating this case to *Rodriquez*.[25]   On October 1, 2012, Barbis was deposed in the *Rodriquez* case.  In relevant part, he provided the following testimony under oath:

> Q [Mr. Praet]:    All right.    So you have an understanding of members or shareholders.  Are there any other members or shareholders of Fresno Rock Taco?
> A [Milton Barbis]:  No.
> Q:  Were there ever any other members or shareholders of Fresno Rock Taco?

---

[25] No motion to consolidate the cases was ever filed.

A:  No.
Q:  So you were the 100 percent sole owner?
A:  I was the sole member who owned 100 percent of the company.

(*Rodriquez*, 1:11-cv-00622-SKO, Doc. 55-4, p. 3; Barbis Depo., p. 16:2-14.)

This case (*National*) was set for an October 30, 2012, trial, but on October 23, 2012, the trial was continued to April 23, 2013.[26]  On February 6, 2013, the April 23, 2013, trial was vacated and eventually reset for May 7, 2013.  (Doc. 178.)[27]

While the parties were awaiting trial in this case, on January 11, 2013, the City and Rhames filed a motion for summary judgment in *Rodriquez*.  (*Rodriquez*, 1:11-cv-00622, Doc. 55.)  Among other issues, these defendants again contended that the LLC plaintiffs (Zone, FRT, and TFI) were precluded from asserting their claims in the *Rodriquez* case because those claims had not been disclosed during the course of the Barbises' bankruptcy proceedings, or the bankruptcy proceedings of the other LLC principals.  The *Rodriquez* defendants cited to Milton Barbis' October 1, 2012, deposition testimony indicating that he was the sole member and 100 percent owner of FRT, while his bankruptcy petition stated he was only a 25 percent owner of FRT.  In opposition to the defendants' motion, Mr. Barbis filed a declaration stating "I did not own 100% of FRT.  I owned 100% of the equity capital but other investors owned 90% of the total capital investment.  I owned only 10% of the total capital."  (*Rodriquez*, No. 1:11-cv-00622-SKO, Doc. 58-6, Barbis Decl., ¶ 39.)

On March 6, 2013, the court in *Rodriquez* issued an order judicially estopping FRT and TFI from asserting their causes of action in the *Rodriquez* case:

> Here, Fresno Rock Taco and The Fine Irishman are judicially estopped from asserting their causes of action in the instant case because the undisputed facts show that each is wholly owned by individuals that filed for bankruptcy and did not disclose the causes of action.  Mr. Barbis' deposition testimony and a declaration prepared for a case in the Northern District [footnote omitted] provides that Mr. Barbis is the sole owner of Fresno Rock Taco.  (Doc. 55-4, p. 3, RT p. 16; Doc. 55-16, p. 5).  Mr. Barbis filed for bankruptcy and did not disclose the causes of action brought by Fresno Rock Taco in the instant case to his creditors.  Thus, Fresno Rock Taco is judicially estopped from pursuing its claims in this Court.  *See*

---

[26] The trial was vacated due to defense counsel unavailability. (Doc. 176.)

[27] The trial was vacated on February 6, 2013, due to unavailability of the district court.  (Doc. 178.)

*Hamilton*, 270 F.3d at 783.  Mr. Barbis' declaration provides that he did not own 100% of Fresno Rock Taco, he "owned 100% of the equity capital but other investors owned 90% of the total capital investment." (Doc. 58-6, p. 6 ¶ 39).  The fact that Mr. Barbis owned 100% of the equity in the company shows that he was the sole owner of the company.

With regard to The Fine Irishman, the company's response to the City's interrogatories provide that John Benjamin is the sole owner of the company. (Doc. 55-5, p. 3:1-6).  Mr. Benjamin did not disclose the instant claims in his bankruptcy petition nor is there any evidence to show that he disclosed the instant claims to his creditors.  Thus, The Fine Irishman is judicially estopped from asserting its claims in this court.  *See Hamilton*, 270 F.3d at 783.  The Fine Irishman argues that the fact Mr. Benjamin did not disclose its current claims to Mr. Benjamin's creditors is not relevant because Mr. Benjamin filed for bankruptcy, not The Fine Irishman. (Doc. 58-1, p. 2).  It is true that Mr. Benjamin filed for bankruptcy and not The Fine Irishman however, because Mr. Benjamin is the sole owner of the company he should have disclosed the fact that The Fine Irishman possessed a potentially valuable asset, the claims in this case. Accordingly, defendants' motion for summary judgment on the claims brought by Fresno Rock Taco and The Fine Irishman is GRANTED.

With regard to Zone Sports Center, there is a genuine dispute as to whether it is judicially estopped from bringing its claims.  It is undisputed that Sphere Properties owns 89.79% of Zone Sports Center and that Granite Park Investors owns the other 10.21%. (Doc. 58-1, p. 3 ¶ 7, 11).  It is further undisputed that Mr. Barbis owns 22% of Sphere Properties and failed to disclose Zone Sports Center's claims to his creditors when he filed for bankruptcy.  It is also undisputed that Mr. Benjamin owns 16.6% of Granite Park Investors and Howard Young owns 12% of the company.  It is further undisputed that both Mr. Benjamin and Mr. Young failed to disclose Zone Sports Center's claims to their creditors when they file for bankruptcy.  Although it is undisputed that three of Zone Sports Center's owners failed to disclose Zone Sports Center's claims to their creditors when they filed for bankruptcy it is unclear who the other investors are and whether they are judicially estopped from bringing Zone Sports Center's claims.  Accordingly, Zone Sports Center is not judicially estopped from bringing its claims in the instant action.

(Doc. 64, 5:6-6:14.)

On April 24, 2013, the twice reopened Barbises' bankruptcy case was once again closed. (Doc. 139.)    On May 7, 2013, this case (*National*) proceeded to trial, while the *Zone* case, pending in the Northern District of California, was dismissed for lack of subject matter jurisdiction on May 22, 2013. (*Zone*, 3:11-cv-634-JSW, Doc. 140.)  During his direct examination at the May 2013 trial in this case, Milton Barbis testified as follows:

Q [Plaintiffs' Counsel]:  And who were you employed by?
A [Milton Barbis]:  I was the managing member of two companies.

1
2
3
4

Q: And what were the two companies?
A: The Zone Sports Center and Fresno Rock Taco.
Q: Would you explain, if you can, what managing member means?
A: It's sort of like the CEO or the chief operating officer of the company.
Q:  The fact that you're the managing member, does that mean you own the company?
A: Absolutely not.

5

(*National*, No. 1:11-cv-00845-SKO, Doc. 244, Trial Transcript, Day 1, 223:4-13.)

6
7
8
9

The jury was unable to reach a unanimous verdict, and a mistrial was declared on May 23, 2013.  The trial was reset for July 31, 2013.  In the interim, each side filed motions to amend the pretrial order, which were addressed by the Court.  No issues with respect to collateral estoppel or judicial estoppel were raised at that time.

10
11
12
13
14

While the parties were awaiting retrial in this case, *Rodriquez* was set for trial on August 14, 2013.  At the pretrial conference in *Rodriquez*, Plaintiffs asserted that FRT was still a party to that case, notwithstanding the March 6, 2013, summary judgment order.  The Court reminded the parties of the March 6, 2013, order regarding judicial estoppel of FRT and TFI, and on July 1, 2013, the plaintiffs filed a motion to certify the March 6, 2013, order for interlocutory appeal.

15
16
17
18
19
20
21
22
23
24

On July 15, 2013, U.S. District Judge O'Neill, the presiding trial judge who had issued the March 6, 2013, summary judgment order in *Rodriquez*, issued an order correcting the judgment originally issued on March 6, 2013.  Due to an oversight, although the Clerk of Court had entered judgment on March 6, 2013, the order failed to expressly direct judgment pursuant to Federal Rule of Civil Procedure 54(b).[28]  As such, on July 15, 2013, an amended judgment was entered on the March 6, 2013, summary judgment order.  (*Rodriguez*, 1:11-cv-00622-SKO, Doc. 96.)  As a result of the July 15, 2013, judgment, the Court denied as moot the *Rodriquez* plaintiffs' motion for certification of an interlocutory appeal.  On July 16, 2013, the *Rodriquez* plaintiffs filed a notice of appeal as to the July 15, 2013, amended judgment.  (*Rodriquez*, 1:11-cv-00622-SKO, Doc. 99.)

25
26
27
28

---

[28] After the summary judgment was issued, the remaining parties consented to the jurisdiction of the undersigned Magistrate Judge, and the case was reassigned.  (*Rodriquez*, 1:11-cv-00622-SKO, Docs. 66, 67, 68.)

18

On Friday, July 26, 2013, at 3:45 p.m., FRT and Zone sought an emergency hearing with the Court in this case (*National*).[29]   At 4:30 p.m., the parties appeared for a telephonic conference before U.S. Magistrate Judge Boone.[30]   Ultimately, the parties agreed that the July 31, 2013, trial should be vacated so that the issue of FRT's standing to pursue its claims could be addressed.[31]   As a result, the trial was vacated on Friday, July 26, 2013, the jury was called off, and the parties were permitted to file motions regarding the issue of FRT's standing to pursue its claims as well as FRT and Zone's contention that National should be sanctioned for seeking to file an untimely dispositive motion on the eve of trial.

The Court denied as untimely National's motion to dismiss FRT's claims based on collateral and judicial estoppel.   The Court noted this case (*National*) and *Rodriquez* had been related at National's request, and National was receiving notice of all docket activity in *Rodriquez*. National conceded it had notice of the March 6, 2013, summary judgment order in *Rodriquez*, but had not reviewed the order.   Counsel for National did not review the order until counsel in *Rodriquez* notified them on July 22, 2013, that the summary judgment order may affect the *National* action.   Additionally, National had already raised the issue of judicial estoppel based on the Barbises' bankruptcy petition in May 2012, and thus the issue of estoppel was well known to National.   In light of its relationship to the *Rodriquez* action and because the judicial estoppel issue was known to National, the Court determined National did not exercise diligence in raising the issue to the Court.   Instead, National waited until *after* the first trial and three days before the re-trial to raise the issues it deemed relevant in the *Rodriquez* order.   The Court therefore denied National's motion to dismiss as untimely.

---

[29] Alerted to the March 6, 2013, summary judgment order in *Rodriquez* by Rodriquez' defense counsel on Tuesday, July 23, 2013, National's counsel conferred with FRT and Zone's counsel on Friday, July 26, 2013, regarding National's intention to file a motion asserting that the March 6, 2013, order had preclusive effect with respect to FRT's standing to assert any claims against National due to the Barbises' failure to disclose the insurance claim on their bankruptcy petition.

[30] The undersigned was unavailable on Friday, July 26, 2013, at 3:45 p.m. when the parties contacted the Court. Judge Boone presided over the hearing based on the parties' representation of an immediate need for judicial intervention.

[31] The parties did not stipulate to the propriety of National's subsequent filing of the motion on July 30, 2013.

In its order denying National's motion, the Court noted the following with respect to FRT:

> Where the sole member of an LLC files for bankruptcy, it effectively assigns the entire membership interest in the LLC to the bankruptcy estate, and the Trustee obtains all the debtor's rights in the LLC, including the right to control the management of the LLC.  *In re First Protection, Inc.*, 440 B.R. 821, 830 (9th Cir. BAP 2010)[32]; *see also In re Albright*, 291 B.R. 538 (Bankr. D. Colo. 2003).

> The Barbises' bankruptcy petition states that the debtors had only a 25 percent interest in FRT.[33]  This disclosure, however, is at odds with statements made by Mr. Barbis under penalty of perjury during the course of the *Red Head* and *Rodriquez* civil litigations.[34]  If FRT's sole member is Milton Barbis, which Mr. Barbis has stated on two occasions is the case, the Bankruptcy Trustee was entitled to step into the shoes of Mr. Barbis and obtain 100 percent management control of FRT through the filing of Mr. Barbis' chapter 7 bankruptcy petition. "Property of the estate that is not scheduled or otherwise administered by the time the case is closed remains property of the estate forever."  *Cheng v. K & S Diversified Invs., Inc.*, 308 B.R. 448, 461 (9th Cir. BAP 2004) (citing 11 U.S.C. § 554(d)).   If management and control, i.e., through the 100 percent ownership interest in FRT, remains with the Bankruptcy Trustee as an unscheduled and un-administered asset of the Barbises' estate, then there is a question whether the Bankruptcy Trustee must be joined to this litigation to direct FRT's claims against National. Fed. R. Civ. P. 19(a).

The Court served its order on the Trustee, and permitted the Trustee, in his discretion, to file a statement in response.  The Trustee filed a declaration that sets forth the following:

> 3.     On or about October 1, 2013, I spoke with Peter Fear, the bankruptcy attorney for Mr. Barbis.  Mr. Fear and I discussed the status of Fresno Rock Taco, LLC.  We discussed the fact that the original schedules filed by Mr. Barbis stated that he owned a 25% interest in Fresno Rock Taco, LLC and that Mr. Barbis, in fact, owned a 100% interest in Fresno Rock Taco, LLC.   I have a vague recollection that Mr. Barbis may have corrected this at the 341 meeting of creditors in this case several years ago, but neither Mr. Fear nor I saw any indication that an amended schedule had been filed.  Mr. Fear informed me that he intended to file an amended schedule correcting this.

---

[32]  Like the Arizona LLC Act that governed the formation and operation of the LLC at issue in *In re First Protection, Inc.*, the California Revised Uniform LLC Act also provides that a membership interest and an economic interest in an LLC constitute personal property of the member.  Cal. Corp. Code § 17300.

[33] (*In re Milton Barbis*, 1:09-bk-60548, Doc. 1, Schedule B, Line 13.)

[34] (*Red Head*, No. 3:08-cv-5703-EMC, Doc. 23, ¶ 1 (Barbis stated that he was "the 100% owner of Fresno Rock Taco, LLC"); *Rodriquez*, 1:11-cv-00622-SKO, Doc. 55-4, p. 3; Barbis Depo., p. 16:2-14 (Barbis provided deposition testimony that he was "the sole member who owned 100 percent of the company").)

1

2

      4.     Mr. Fear also provided me with additional documentation regarding the assets and liabilities of Fresno Rock Taco, LLC and asked me whether I intended to exercise control of the LLC and to become involved in the above-captioned litigation.

3

4

      5.     I have reviewed those documents and I have discussed said documents with Mr. Fear.

5

6

7

8

9

      6.     Based on this information, I, on behalf of the bankruptcy estate, do not intend to replace the current management of Fresno Rock Taco, LLC and I will not be taking any involvement in the above-captioned litigation.  I intend to abandon any interest the estate has in Fresno Rock Taco, LLC to the Debtors in the Bankruptcy Case.  I have filed a final report that will likely result in the Bankruptcy Case closing within the next two to three months.  That will result in Fresno Rock Taco, LLC being abandoned to the debtors in the Bankruptcy Case.

10

      7.     I have not taken any action to replace the current management of the Fresno Rock Taco LLC and have no intention of taking any such action.

11

12

(Doc. 312, Declaration of James E. Salven, Bankruptcy Trustee.)

13

14

15

16

      On September 19, 2013, the Barbises' bankruptcy case was reopened for administrative purposes.  (*In Re Milton Barbis*, 1:09-bk-60548, Doc. 141.)   On September 20, 2013, the Trustee filed a Final Account and Distribution Report, and the Bankruptcy case was closed on October 28, 2013.

17

18

19

20

21

      In November 2013, the re-trial in this case was set for May 28, 2014.  (Doc. 316.)  On December 17, 2013, in the bankruptcy case, the Barbises filed an Amended Summary of Schedules and an Amended/Modified Voluntary Petition reflecting the Barbises' 100% interest in FRT.  (Doc. 150, 151.)  The Bankruptcy Case was not reopened, and as of the date of this order, there are no further docket entries in that case.

22

### III.   DISCUSSION

23

**A.**    **Legal Standard**

24

25

26

27

28

      Courts may alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59(e). Rule 59(e) is generally seen as "an 'extraordinary remedy, to be used sparingly'" and at the discretion of the Court.  *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003) (citations omitted); see also *McQuillion v. Duncan*, 342 F.3d 1012, 1013 (9th Cir. 2003).  A motion to alter or amend a judgment "'should not be granted, absent highly unusual circumstances, unless the district court

is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.'" *McDowell v. Calderon*, 197 F.3d 1253, 1255 (9th Cir. 1999) (en banc) (citations omitted).  "To succeed [on a motion to alter or amend judgment], a party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision." *United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1131 (E.D. Cal. 2001).   "'Mere doubts or disagreements about the wisdom of the prior decision of this or a lower court will not suffice[.]'"  *Campion v. Old Republic Home Protection Co.*, 2011 WL 1935967, at *1 (S.D. Cal. May 20, 2011) (quoting *Hopewood v. Texas*, 236 F.3d 256, 273 (5th Cir. 2000) (citations omitted)).  "To be clearly erroneous, a decision must strike [a court] as more than just maybe wrong or probably wrong; it must be dead wrong." *Id.*  A Rule 59(e) motion may not be used to relitigate old matters or to raise arguments or present evidence that could have been raised prior to entry of judgment.  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008); *accord Kona Enters, Inc.. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000) ("A Rule 59(e) motion may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation.").

**B.      National's Motion to Amend the Judgment Pursuant to Rule 59 is DENIED**

   **1.      National Provides No Authority to Support Reconsideration of a One-Year-Old Interlocutory Order Denying a Dispositive Motion**

National contends the Court should *now* reach the merits of its motion to dismiss that was denied as untimely in September 2013.  National asserts since the trial is now over, the scheduling order is irrelevant, and the Court can now reach the merits of the motion which it previously denied as untimely.  National cites *Smith v. Clark County School Dist.*, 727 F.3d 950 (9th Cir. 2013) for the proposition that this Court may, after trial and judgment, reconsider a prior interlocutory order denying a dispositive motion.   In *Smith*, the district court denied the defendant's motion for summary judgment and upon an immediate motion for reconsideration by the defendant, reversed its order, granted the defendant's motion, and entered judgment.  The plaintiff then filed a post-judgment motion for reconsideration under Rule 59, which was denied and the case was appealed.

1    The procedural facts of *Smith* are *not* similar to this case.  The original motion for

2    reconsideration in *Smith* came immediately after the denial of a dispositive motion and was not

3    made pursuant to Rule 59.  The plaintiff's post-judgment motion under Rule 59 sought

4    reconsideration of the court's order *granting* summary judgment which resulted in an appealable

5    judgment.  The defendant did not wait to file its motion for reconsideration on the court's original

6    order denying summary judgment until after a trial on the merits.  Here, National waited until *after*

7    a trial on the merits to seek reconsideration of an interlocutory order denying a dispositive motion.

8    *Smith* does not stand for the proposition that the Court may reconsider a prior denial of a

9    dispositive order after a trial on the merits pursuant to Rule 59.

10    **2.**    **No Manifest Error of Law in the September 17, 2013, Order**

11    Despite the lack of authority that Rule 59 may be used as a procedural method to review a

12    prior interlocutory order, the Court will nonetheless address National's remaining arguments

13    regarding the September 17, 2013, order.

14    National argues the Court's decision to deny its motion to dismiss FRT's claims on grounds

15    of collateral and judicial estoppel as untimely was error.  National maintains that it could not have

16    filed its motion to dismiss any sooner than July 15, 2013, when the summary judgment order in

17    *Rodriquez* became appealable because of the amended judgment issued by the Court.  According

18    to National, the doctrine of collateral estoppel can *never* apply to an order that is not appealable,

19    thus it could not have pursued that theory when the *Rodriquez* summary judgment order was

20    issued in March 2013.  National claims it was therefore diligent in seeking to file a motion to

21    dismiss FRT's claims 3 days before the July 2013 re-trial.  National maintains the Court's finding

22    that it was not diligent was manifest error and unjust as FRT was permitted to proceed to trial on

23    its claims and was not judicially estopped from asserting them.

24    First, Rule 59 is not a vehicle to relitigate old matters that could have been previously

25    addressed.  *Exxon Shipping Co.*, 554 U.S. at 485 n.5.  The Court denied National's motion to

26    dismiss in September 2013, and the retrial was reset for May 2014; thus National could have

27    sought reconsideration of any asserted error of law in the Court's September 2013 order prior to

28    the August 2014 retrial.

1    Second, there was no manifest error of law.  The appealability of the order in *Rodriguez*

2    was not dispositive of its finality for purposes of collateral estoppel.[35]   The appealability of an

3    order may be the linchpin of any finality determination for purposes of collateral estoppel (issue

4    preclusion), but it is not the *only* consideration nor is it *the* bright-line requirement in determining

5    finality for purposes of collateral estoppel.  *Free Speech Coalition, Inc. v. Attorney General of the*

6    *United States*, 677 F.3d 519, 541 (3d Cir. 2012) (citing same factors for determining finality for

7    issue preclusion as *Luben Industries, Inc. v. United States*, 707 F.2d 1037 (9th Cir. 1983) and

8    stating "[t]here is no bright-line rule regarding what constitutes a 'final judgment' for issue

9    preclusion").[36]

10    Third, National could have timely raised the issue of collateral estoppel immediately after

11    the *Rodriguez* order was issued, thereby allowing the Court to consider the finality of that order,

12    among other things, without disrupting the scheduled retrial.  National's lack of diligence centered

13    on National's failure to timely read and appreciate the order in *Rodriguez*, not on the precise

14    remedy it chose to pursue.  As discussed in the original decision,

15    . . . National's failure to timely review the March 6, 2013, order in *Rodriguez* was
      problematic for several reasons.  First, *Rodriguez* was not simply an unrelated case

16

17    [35] National cites cases relating to finality for purposes of application of the res judicata doctrine; this is distinct from
      collateral estoppel and the terms are not interchangeable.  *Johnson v. Mateer*, 625 F.2d 240, 243 n.5 (9th Cir. 1980)

18    ("Although often used interchangeably, the terms 'res judicata' and 'collateral estoppel' apply to related but distinct
      doctrines.").

19    [36] The Restatement Second of Judgments provides the following discussion:

20    Usually there is no occasion to interpret finality less strictly when the question is one of issue
      preclusion, that is, when the question is whether decision of a given issue in an action may be

21    carried over to a second action in which it is again being litigated . . . .  But to hold invariably that
      that kind of carry-over is not to be permitted until a final judgment in the strict sense has been

22    reached in the first action can involve hardship – either needless duplication of effort and expense in
      the second action to decide the same issue, or, alternatively, postponement of the issue in the second

23    action for a possibly lengthy period of time until the first action has gone to complete finish.  In
      particular circumstances the wisest course is to regard the prior decision of the issue as final for

24    purposes of issue preclusion without awaiting the end judgment.  Before doing so, the court should
      determine that the decision to be carried over was adequately deliberated and firm, even if not final

25    in the sense of forming a basis for a judgment already entered.  Thus preclusion should be refused if
      the decision was avowedly tentative.  On the other hand, that the parties were fully heard, that the

26    court supported its decision with a reasoned opinion, that the decision was subject to appeal or was
      in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for

27    purposes of preclusion.

      Restatement (Second) of Judgments § 13 (Comment g) (West 2014).

28

involving FRT, to which National was not a party.  National was aware of the issues in *Rodriquez* because it filed a notice of related cases on September 5, 2012, asserting the cases were so closely linked they should be tried together.  Given National's knowledge of the relationship between *Rodriquez* and the present case, National should have been aware that the issue of judicial estoppel of FRT had already been raised in *Rodriquez* and the court in *Rodriquez* had expressly stated it would be willing to entertain the issue again on a more complete record at summary judgment.

Second, because National had filed its own motion to judicially estop FRT and Zone from asserting claims against National in May 2012, it was fully aware of the relevance of any subsequent findings made in *Rodriquez* with respect to Milton Barbis' ownership interest in FRT and Barbis' obligation to report any potential or contingent claims of FT on his personal bankruptcy petition.

(Doc. 311, 18:14-28.)

Moreover, even if National had reviewed the *Rodriquez* order in March 2013 but determined it could not seek collateral estoppel based on finality considerations, it could have filed a motion for reconsideration of the May 2012 order in this case denying its motion for judgment on the pleadings, which was based on the same judicial estoppel grounds as the *Rodriquez* defendants' motion.

National notes finally that Mr. Barbis amended his bankruptcy petition in December 2013 to reflect his 100 percent ownership of FRT, but failed again to disclose FRT's claims against National.   National contends that Mr. Barbis has played fast and loose with the court system and the jury verdict in FRT's favor should not be permitted to stand.   At the November 18, 2014, hearing, National also argued Mr. Barbis' amended bankruptcy filing in December 2013 was new evidence that justifies reconsideration.

The Court's September 2013 order was served on Mr. Salven, the U.S. Bankruptcy Trustee who oversaw the Barbises' bankruptcy estate.  After reviewing the order and with notice of FRT's claims against National, Mr. Salven filed a declaration stating he was aware of Mr. Barbis' 100 percent interest in FRT and expressly disclaimed an interest in FRT on behalf of the bankruptcy estate and abandoned the interest in FRT to the debtors.  (Doc. 312.)  Due to the Trustee's knowledge of FRT's claims prior to the August 2014 retrial, it is questionable whether equity

1   would dictate judicial estoppel of FRT's claims against National, particularly as FRT was not a

2   debtor in the Barbises' bankruptcy proceeding.

3       As to "new" evidence in Barbis' bankruptcy case filed in December 2013, Barbis' failure to

4   list FRT's claim against National in the Barbises' amended schedule changes nothing.   As

5   Plaintiffs note, the December 2013 amended bankruptcy schedule indicated Barbis' ownership

6   interest in FRT which reflected a correction made by Barbis at a 341 creditor hearing years ago of

7   which Mr. Salven was aware – it was not a wholesale or substantive change to the petition.

8   Additionally, Mr. Salven was on notice of FRT's claims against National in September 2013, and

9   nonetheless declared his intent to abandon any interest in FRT to the debtors.[37]   And, Judge

10  O'Neill's order in *Rodriquez* notwithstanding, National has never presented any case authority that

11  an individual debtor's failure to list the contingent claims of a separate corporate entity of which

12  that debtor has a 100 percent ownership interest may judicially estop the entity from pursing its

13  claims.

14      In sum, National's motion that the Court reconsider its September 2013 denial of National's

15  motion to dismiss is DENIED.

16      **3.      National's Motion to Amend the Judgment Due to Jury Error is DENIED**

17      National's motion to amend challenges the jury's verdict with respect to elements of

18  damages awarded.   Pursuant to National's request, the special verdict form requested that the jury

19  enter an aggregated damage amount for any contract damages awarded.   National now asserts the

20  jury's damage award improperly included certain elements of damages that are either not

21  recoverable or are limited by the terms of Plaintiffs' policies.

22      Where a jury awards damages in a lump sum, or in an aggregated amount, the award is

23  generally not disturbed unless the resulting award exceeds the amount sustainable by the evidence

24  in the record.  *L.A. Mem. Coliseum Comm'n v. NFL,* 791 F.2d 1356, 1366 (9th Cir. 1986).  "Even a

25  total inadequacy of proof on isolated elements of damages claims submitted to a jury will not

26  undermine a resulting aggregated verdict which is nevertheless reasonable in light of the totality of

27  the evidence."  *Id.*

28

---

[37] The Court takes no position on whether such abandonment was effective.

1    Plaintiffs presented evidence that they suffered property damage and lost profits and that

2  FRT lost tenant improvements.  As to FRT and Zone's lost profits, Dr. Luna testified regarding

3  lost profits for five years and lost profits extending to the end of FRT's lease with Zone.  Because

4  the award is aggregated, it is not clear precisely what damage elements the jury included in its

5  award.   Dr. Luna testified to lost profits of FRT and Zone that far exceeded the amount of the

6  aggregated contract damages awarded.  Whether other elements of damages were not sustainable

7  or awardable does not necessarily undercut the jury's damage award.   Nevertheless, the Court

8  considers National's argument as to individual elements of damages below.

9                **a.       Tenant Improvements Were Properly Considered As Damages**

10    National argues the jury's award of damages was solely for breach of contract, rather than

11  for the breach of the covenant of good faith and fair dealing.  According to National, damages are

12  therefore limited to covered benefits under the policy, and the jury award violates that rule because

13  it necessarily includes the cost of tenant improvements that Dr. Luna opined FRT incurred as

14  damage as a result of National's failure to pay FRT's claim.[38]   National maintains tenant

15  improvements cannot be recovered as consequential damages because such damages were not

16  foreseeable at the time the parties entered the contract.  Specifically, National contends that when

17  FRT purchased the insurance policy, it was not foreseeable that a burglary would require

18  constructing an entirely new restaurant.  National cites *California Shoppers, Inc. v. Royal Globe*

19  *Ins. Co.*, 175 Cal. App. 3d 1 (1985) as analogously instructive to the foreseeability of FRT's tenant

20  improvements.  Because this damage was not foreseeable as a matter of law, National contends the

21  jury made a manifest error of law in awarding tenant improvements as consequential damages

22  which should be corrected by the Court under Rule 59.[39]

23    Plaintiffs argue that consequential damages are recoverable for breach of contract and are

24  not limited by the contract terms.  (Doc. 385, 17:20-22.)  Plaintiffs maintain that when issuing an

---

[38]   Because of National's breach, FRT claimed it was forced to walk away from its business, including the tenant improvements it made, as FRT rented the structure's "pad" from Zone.

[39] The parties disputed whether the special verdict form should include a breakdown of damages or whether it should provide only an aggregated damage amount that did not break down the different elements of the damage award. National sought to have the jury aggregate the damages into a single number, which was ultimately granted.

insurance policy that provides business interruption coverage, an insurer should foresee that any breach of its obligations could potentially result in the demise of the insured's business.  "That National did not literally contemplate having to pay for FRT's tenant improvements if it breached the contract does not mean the damages are not recoverable."  (Doc. 385, 22:16-17.)   Plaintiffs contend National inspected the property in question prior to selling and binding the insurance policy and knew the inability to use the entertainment system valued at $414,000 (25 percent of FRT's assets) was critical to the operation of the business.  It was foreseeable that a breach of contract at a vulnerable time could, and did in this case, lead to a greater loss than simply the claimed amount for property loss.  According to Plaintiffs, business interruption coverage is designed to ensure the financial support necessary to sustain business operations in the event of a disaster.  If an insurer fails to promptly and honestly evaluate a business interruption claim, it is logical that the breach could destroy the insured's business. (Doc. 385, 18:25-19:2.)

The statutory measure of damages for breach of contract is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300. "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515 (1994).  The insured party's damage cannot, however, exceed what it would have received if the contract had been fully performed on both sides.  Cal. Civ. Code § 3358.  This damage limitation for breach of contract "serves to encourage contractual relations and commercial activity by enabling parties to estimate in advance the financial risks of their enterprise." *Applied Equipment Corp.*, 7 Cal. 4th at 515.

Contractual damages are comprised of two types: general damages (also called direct damages) and special damages (also called consequential damages).  *See e.g., Erlich v. Menezes*, 21 Cal. 4th 543, 558 (1999).   "General damages are often characterized as those that flow directly and necessarily from a breach of contract, or that are a natural result of a breach." *Lewis Jorge Const. Mgmt., Inc. v. Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968-69 (2004) (citing Cal. Civ.

Code § 3300 and *Mitchell v. Clark*, 71 Cal. 163, 167-68 (1886)).  As general damages are both a natural and necessary consequence of a contract breach, "they are often said to be within the contemplation of the parties, meaning that because their occurrence is sufficiently predictable the parties at the time of contracting are 'deemed' to have contemplated them." *Id.* (citing Calamari & Perillo, The Law of Contracts (2d ed. 1977) § 14-5, p. 525; *Hunt Bros Co. v. San Lorenzo Water Co.*, 150 Cal. 51, 56 (1906)).

Special damages, on the other hand, are "those losses that do not arise directly and inevitably from any similar breach of any similar agreement.  Instead they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties." *Lewis Jorge Const. Mgmt.*, 34 Cal. 4th at 969.  Special damages are not presumed from mere breach, but represent loss that occurred by reason of injuries following from the breach.  *Id.*

In *California Shoppers*, a jury verdict was entered against a defendant insurer for failing to defend and indemnify its insured against a third-party claim.  *California Shoppers*, 175 Cal. App. 3d at 59. California Shoppers was an outgrowth of a company called Adco Advertising, Inc. ("Adco") that published a give-away type newspaper called the Pennysaver.  Some of the principals of Adco decided to form a separate company, California Shoppers, to distribute the same type of paper in a different area.  California Shoppers sought an insurance policy from Royal Globe, who also insured Adco.  When California Shoppers began distributing its paper, it was sued by Uneedus Corporation, a local competitor who alleged California Shoppers was violating the Unfair Practices Act.  California Shoppers tendered defense of the Uneedus' complaint to Royal Globe, but Royal Globe denied the tender mistakenly believing the tender came from Adco. The Uneedus case ultimately resulted in a damage award against California Shoppers, and California Shoppers sued Royal Globe for breach of contract and breach of the duty of good faith and fair dealing.  The jury awarded California Shoppers $86,500 to satisfy the Uneedus judgment, expenses of $39,000 incurred in defending the Uneedus action, $3 million in economic or business loss, as well as other items of damages.  The insurer, Royal Globe, appealed the judgment.  The appellate court affirmed the jury's award of damages for indemnity and the failure to defend, but

1  reversed the $3 million in economic loss damages finding that it could not be awarded under either

2  a tort or a contract theory.

3       California Shoppers based its entitlement to economic damages on the premise that it was

4  forced to sell its assets for $1.5 million after the verdict was announced in the *Uneedus* action.

5  According to California Shoppers, it had started the business with the goal of selling it for a profit;

6  had it been able to sell at a different time, it would have realized a much greater profit.

7       In reversing the award of economic damages, the appellate court noted that the sale of

8  California Shoppers' assets occurred in June 1977, more than two years after Royal Globe refused

9  tender of the *Uneedus* action belying California Shoppers' allegation that it was immediately

10  harmed as a result of the refusal to defend.  *Id.* at 28.   The court reasoned the insurance policy

11  providing for Royal Globe's duty to defend third-party actions was only a peripheral item in terms

12  of the business conducted by California Shoppers.  "In other words, California Shoppers was not

13  primarily in business to defend itself against litigation, it was primarily in business to publish an

14  'advertiser' type newspaper which depended for income on the sale of advertising.  Its day-to-day

15  successful functioning had very little, if any, relationship to whether it was insured against the

16  possibility of having to hire its own lawyer if sued within the area of risk otherwise covered by the

17  policy."  *Id.* at 60.

18       The court further reasoned that to bring the $3 million of consequential damages into the

19  realm of foreseeability at the time the duty-to-defend coverage was purchased, the following series

20  of assumptions would have to be made: (1) California Shoppers would violate the Unfair Practices

21  Act; (2) a competitor would sue for the violation; (3) Royal Globe would decline coverage and

22  tender of the defense; (4) because of $39,000 incurred in attorney's fees to defend the action,

23  Shoppers would be forced to sell the publishing enterprise for $1.5 million; and (5) Royal Globe

24  was aware of the California Shoppers' long-range plan to sell the business at a later date after it

25  had greatly appreciated in value.  *Id.*   The court noted that a former shareholder of California

26  Shoppers testified that he did not think any of the other shareholders considered the *Uneedus*

27  action "a big deal," and that the "prevailing sentiment was not like 'Oh my God, we're in deep

28  trouble.  It was, Royal Globe won't defend us, we'll let Kindel and Anderson do it.  We'll just keep

going.'"  *Id.* at 60, n.5.  The court found the mere recital of the requisite combination of items the parties would have had to consider demonstrated the economic loss could not be awarded as consequential damages for breach of the duty to defend.  "In short, measured by the terms of section 3300 of the Civil Code, there was no evidence that a breach of the contractual duty to defend contemplated California Shoppers' loss of $3 million under California Shoppers' theory of how it suffered economic loss."  *Id.* at 60.

The attenuated link between the insurance denial and the damages claimed in *California Shoppers* is distinguishable from this case.  Unlike the pertinent defense coverage in *California Shoppers*, the audio/visual equipment loss here was directly tied to FRT's business operations.  While the appellate court noted California Shoppers was not in the business of defending itself, FRT was in the nightclub business and alleged it was unable to reopen without the audio/visual equipment.  When insuring the property and/or operating equipment of a business, it is reasonably foreseeable that an insurer's refusal to pay for replacing equipment necessary to the functioning of a business would result in the businesses' inability to resume operations and could result in complete failure and closure of the business.  Although National contends it was not foreseeable that such a relatively small property damage claim would lead to the entire shut-down of the business, if the property loss is essential to the functioning of the business, then it *is* reasonably foreseeable that the loss – if not remedied – could cause the business to fail.

Moreover, FRT's policy included business interruption coverage.  If a business suffers a covered loss which is wrongfully denied, thereby causing a drawn-out period of ceased business operations, it is reasonably foreseeable that the business would fail.  Given the nature of the coverage at issue, it was within the parties' contemplation at the time of entering into the contract that if National wrongfully failed to pay a claim for property loss directly tied to FRT's functioning or failed to pay for business interruption arising out of the loss of necessary equipment, the business may not be able to resume operations and may fail.

Due to the nature of the relationship between an insurer and its insured, and the type of insurance coverage in this case, FRT's loss of its tenant improvements was reasonably foreseeable.

1    As such, to the extent the jury awarded tenant improvements as a consequential damage for breach

2    of contract, it was not manifest error of law.

3                           **b.      Period of Restoration**

4        National challenges whether the jury award, which undoubtedly included FRT's lost

5    profits, is legally permissibly in light of FRT's policy language.   FRT's business interruption

6    coverage states as follows:

> We will pay for the actual loss of Business Income you sustain due to the necessary
> suspension of your operations during the period of restoration.   The suspension
> must be caused by direct physical loss of or damage to property at the premises
> described in the Declarations . . . caused by or resulting from any Covered Cause of
> Loss.

10   The policy also defines "Business Income" as follows:

> Business income means the:
>
> (1)    Net Income (Net Profit or loss before income taxes) that would have been
>        earned or incurred; and
> (2)    Continuing normal operating expenses incurred, including payroll.

15       Finally, the policy limits payments for Business Income to the length of the Period of

16   Restoration, which is defined as follows:

> 3.    Period of Restoration means the period of time that:
>
> a.    Begins with the date of direct physical loss or damage caused by or
>       resulting from any Covered Cause of Loss at the described premises;
>       and
> b.    Ends on the date when the property at the described premises should
>       be repaired, rebuilt or replaced with reasonable speed and similar
>       quality.

22       According to National, the maximum legally supportable award for breach of contract is

23   limited under the policy terms to the Period of Restoration from theft. National contends the

24   Period of Restoration is an objective measure which is defined as the theoretically reasonable time

25   required to rebuild under the circumstances – it does not take into account subjective issues faced

26   by the insured, such as its ability to pay.  National notes Plaintiffs did not provide any evidence of

27   how long it would take them to recover from the theft, but argues Barbis testified a "complete

28   renovation" of the premises from the Cabo Wabo Cantina to Memphis Blues would take no longer

1   than three months from December 12, 2008, to the end of March 2009.  National reasons a

2   complete remodel is much more extensive than repairing theft damage and therefore it is manifest

3   "error of fact" to award business income loss for a period longer than three months.  Based on Dr.

4   Luna's testimony, three months of FRT's *lost profits* equals $204,057.24.  National maintains this

5   is the maximum amount of business income that can be awarded under the terms of the contract.

6        Plaintiffs argue that by not paying for the repairs or replacing the stolen equipment, and

7   then denying coverage all together, National lost any claim to a limited Period of Restoration.

8   Plaintiffs argue the burden of proving that the losses could have been avoided lies with the party

9   who has breached the contract, and National's delay in conducting an investigation of damage to

10  the interior of the premises extended the Period of Restoration.  National failed to introduce any

11  evidence that Plaintiffs failed to mitigate their damages, and it is disingenuous for National to

12  argue that Plaintiffs had a duty to get the restaurant/nightclub "back up and running" in 90 days.

13       While the interpretation of policy language is a legal issue under California law, what

14  constitutes a reasonable period to carry out the necessary repairs and resume business for purposes

15  of the period of restoration is a question for the jury.  *See Michel Family Trust v. Travelers Indem.*

16  *Co. of Conn.*, No. 09-cv-4144-PSG, 2011 WL 207955, at *5 (N.D. Cal. Jan. 21, 2011)

17  (determining factual dispute regarding the length of the Period of Restoration was an issue for the

18  jury that could not be resolved on summary judgment).  Here, the jury was not instructed or asked

19  in the special verdict form to consider the time it would take to repair, rebuild, or replace FRT's

20  damaged property with reasonable speed and similar quality.    No trial testimony directly

21  applicable to this issue was solicited by either party.  Mr. Barbis testified that a remodel of the

22  insured premises to convert it from Cabo Wabo Cantina to Memphis Blues began in September

23  2008, and they anticipated completion in March 2009.  In December 2008, the club was closed

24  completely so the remodel could occur.  As Plaintiffs note, however, this testimony is not related

25  to the amount of time it would take to reinstall stolen equipment and repair damage to the interior

26  of the building as a result of the theft.  Moreover, as Barbis testified that the remodel was started

27  in September 2008, while the club was still open, it is not entirely accurate that Barbis estimated

28  the entire remodel would take only three months.

1    Plaintiffs also argue Binder testified that the original installation of the equipment took

2  approximately 6 months.   National notes the original installation involved more and different

3  types of equipment than that associated with repairing the theft damage, thus six months is not an

4  accurate estimate for the repairs necessary after the theft.

5    Neither Barbis' nor Binder's testimony directly addresses the length of time required to

6  repair the damage to the property after the theft and to replace missing equipment.    And, as

7  Plaintiffs note, the period of restoration has been extended where events occurred outside the

8  control of the insured.  In *Hampton Foods, Inc. v. Aetna Casualty & Surety Co.*, 843 F.2d 1140,

9  1144 (8th Cir. 1988) (applying Missouri law), the court held there was evidence offered which

10  sustained a finding that delay in resumption of business was due to the insurer's failure to pay

11  under the policy and the insured was thus entitled to recover its business interruption losses during

12  the period of delay in resuming business.  Here, there was evidence that National never inspected

13  the property, delayed denial of the claim for nearly a year after it was submitted, and then – as the

14  jury determined – wrongfully denied the claim.   This delay and refusal to pay the claim was a

15  basis to extend the period of restoration as in *Hampton Foods*.   843 F.2d at 1143-44 (affirming

16  district court's finding that insurer's refusal to pay insured amounts owed under the policy

17  prevented prompt restoration of the business).

18    National also maintains that FRT's poor financial condition cannot be a basis to extend the

19  period of restoration.  National essentially asserts FRT had a duty to repair the premises prior to

20  National's payment of the claim – the fact that FRT could not afford to repair the premises is not a

21  basis to extend out the period of restoration.   The insured's poor financial condition is only

22  irrelevant to extending the period of restoration if the insurer paid the insured the amount owed

23  under the policy, but the insured was *still* unable to complete the restoration timely because of its

24  own financial condition.  *See Hampton Foods, Inc.*, 843 F.2d at 1143-44.  National provides no

25  authority for the proposition that Plaintiffs were required to complete repairs arising from the theft

26  where National was found to have wrongfully denied the claim for the stolen equipment in the

27  amount of $124,349.

28

Assuming the jury award included $124,349 for FRT's stolen property and $1,653,726 for tenant improvements, the remaining amount of damages awarded ($446,274) would consist of business interruption losses.   Dr. Luna testified that one year of FRT's lost profits totaled $599,673.   Evidence was offered at trial that National failed to conduct a site inspection of the Cantina after the theft and National did not deny the claim for nearly a year; moreover, the jury found National wrongfully denied the claim.   Even if three months was a reasonable estimate for completing the repair work, there was evidence to support an extended period of restoration well beyond three months.   In view of the evidence offered at trial, the court **cannot** conclude the jury's aggregate award of $2,246,349 to FRT constituted manifest error.

National also argues that the award to Zone must likewise be reduced to account for the Period of Restoration.   Dr. Luna testified Zone's loss of rent from FRT was $433,554 for a 12-month period.   Given that the Period of Restoration was subject to extension due to evidence of National's failure to investigate the site and wrongful denial of the claim, the jury verdict of $274,823 for Zone is sustainable.   As such, the damage award to Zone does not constitute manifest error.[40]

For the reasons stated above, National's motion to amend the judgment is DENIED.

## C.   Plaintiffs' Motion to Amend the Judgment to Include Prejudment and Post-judgment Interest is GRANTED in part and DENIED in part

### 1.   Post-judgment Interest

In a diversity action, federal law governs the award of post-judgment interest.   *AT&T Co. v. United Computer Sys., Inc.*, 98 F.3d 1206, 1209 (9th Cir. 1996).   Post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court . . . [and] shall be calculated from the date of the entry of judgment . . . "  28 U.S.C. § 1961.   The parties do not dispute that Plaintiffs are entitled to post-judgment interest.   As such, Plaintiffs' motion to amend the judgment to include post-judgment interest is GRANTED.

---

[40] At the November 18, 2014, hearing National withdrew its arguments regarding a double-recovery to Zone.

### 2. Prejudgment Interest

"In diversity actions, state law determines the rate of prejudgment interest, and postjudgment interest is governed by federal law." *AT&T Co.,* 98 F.3d at 1209. In California, prejudgment interest is governed by Civil Code section 3287, which provides:

> (a) Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt . . . .
>
> (b) Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed.

Cal. Civ. Code § 3287.

Prejudgment interest is recoverable where the damages awarded at trial were "certain, or capable of being made certain by calculation" as of a particular prior date. Cal. Civ. Code § 3287(a). "The test for recovery of prejudgment interest under [Section 3287(a)] is whether defendant (1) actually knows the amount of damages owed to plaintiff, or (2) could have computed that amount from reasonably available information." *KGM Harvesting Co. v. Fresh Network*, 36 Cal. App. 4th 376, 391 (1995).

#### a. The Jury's Damage Award Did Not Include Interest

Plaintiffs seek prejudgment interest on the jury's damage award from the date of National's wrongful denial of their claim on February 4, 2010. National opposes Plaintiffs' request asserting that because Dr. Luna testified about opportunity interest, the question of prejudgment interest was already presented to the jury. Whether or not the aggregated jury award includes interest was solely in the hands of the jury. If the jury awarded interest, then Plaintiffs cannot recover prejudgment interest again. If the jury did not award interest, it was within their province not to do so. Either way, according to National, Plaintiffs are not entitled to prejudgment interest on the jury verdict.

National cites no authority for the proposition that the jury may award prejudgment interest pursuant to California Civil Code Section 3287(a), particularly in the absence of any instruction on the ascertainability of elements of the damage award.  As observed by the Ninth Circuit, the issue of prejudgment interest under Section 3287(a) is primarily a question of law.  *Brocklesby v. United States*, 767 F.2d 1288 (9th Cir. 1985).  Moreover, Section 3287 provides that a party is *entitled* to prejudgment interest on any liquidated claims for which he recovers.  Cal. Civ. Code § 3287(a) ("A person who is entitled to recover damages certain . . . is entitled also to recover interest thereon from that day . . . ").  If the jury simply refused to award prejudgment interest on the liquidated damages awarded, it is difficult to synthesize such a result with the language of the statute.

In any event, notwithstanding the aggregated damage award, the verdict form indicates the jury did not award interest, despite Dr. Luna's testimony regarding various opportunity interest calculations for each damage figure.  The verdict form asked the jury to indicate "the amount of the covered loss that National Surety Corporation failed to pay to Fresno Rock Taco, LLC."  (Doc. 364.)  The term "covered loss" was referred to in Jury Instruction No. 32.[41]  Interest was not presented as a covered loss under the policy, nor was it presented in Dr. Luna's damage testimony as a covered loss.  Given the precise call of the question in the verdict form, the jury had no opportunity to award interest to Plaintiffs, despite Dr. Luna's testimony regarding opportunity interest.  Rather, the jury was asked very specifically to determine "the amount of the covered loss" under the policy.

        **b.**       **Discrepancy Between Pre-Trial Damage Demand and Verdict Amount**

---

[41] Jury Instruction 32 states as follows (Doc. 366, p. 37):

> Plaintiffs Fresno Rock Taco, LLC and Zone Sports Center, LLC claim that Defendant National Surety Corporation breached its duty to pay it for a covered loss under an insurance policy.  To establish this claim, Plaintiffs Fresno Rock Taco, LLC and Zone Sports Center, LLC must prove all of the following:

> 1.  That Plaintiffs Fresno Rock Taco, LLC and Zone Sports Center, LLC suffered a loss which was covered under an insurance policy with Defendant National Surety Corporation;

> 2.  That Defendant National Surety Corporation was notified of the loss as required by the policy; and

> 3.  The amount of the covered loss that Defendant National Surety Corporation failed to pay.

1    National also argues Plaintiffs may not recover interest under Section 3287(a) because of

2  the large discrepancy between Plaintiffs' pre-trial demand and the ultimate amount awarded by the

3  jury.  According to National, such a large discrepancy is evidence that the awarded damages were

4  not certain or capable of being made certain such that they are considered liquidated for purposes

5  of Section 3287(a).  National cites *Polster, Inc. v. Swing*, 164 Cal. App. 3d 427, 345 (1985) for the

6  proposition that where the amount of the original demand differs drastically from the ultimate jury

7  award, it indicates the damages were not certain at the time of the breach.  National notes that

8  Plaintiffs made a $4,745,477 pre-trial demand for FRT's damages and a $13,678,927 demand for

9  Zone's damages, but the jury awards were significantly less than those demands.  National

10  maintains that throughout the life of this case, there were sharp conflicts within Plaintiffs' own

11  evidence of damages which signifies that the damages were not liquidated.

12    Plaintiffs assert it is misleading for National to equate terms such as "original claim," and

13  "initial claim" with "pre-trial demand."  National ignored Plaintiffs' business interruption claim

14  and never opened and investigated the business interruption claim.  As a result, National never

15  acquired Plaintiffs' original demand or claim for business interruption.  National's opposing brief

16  instead uses amounts which National admits were damage amounts for 5 and 10 years after the

17  initial demand.  According to Plaintiff, those numbers are higher and different because it was too

18  late for National to go back and simply do "[its] job by investigating the claim and ascertaining the

19  amount owed under the policy."  (Doc. 386, 4:2-4.)  Plaintiffs also assert *Polster, Inc.* is

20  distinguishable because the plaintiff in that case was obligated to provide the defendant with an

21  estimate of damages within a reasonable time after their loss, but failed to do so.  Further, the

22  defendant in *Polster, Inc.* "actually made an effort to resolve the case by doing their own estimates

23  and providing their own descriptions of the damage."  (Doc. 386, 2:14-16.)  After the two parties

24  failed to agree, the plaintiff filed suit but received a jury award far lower than the plaintiff's

25  original damage estimate.  Here, Plaintiffs maintain National never opened or investigated their

26  claim for business interruption and thus there was no legitimate dispute as to the amount owed.

27    Where there is a large discrepancy between the amount of damages demanded in the

28  complaint and the size of the eventual award, that fact militates against a finding of the certainty

1    mandated by Section 3287(a).  *Chesapeake Industries, Inc. v. Togova Enterprises, Inc.*, 149 Cal.

2    App. 3d 901, 910 (1983).  Plaintiffs' damage award ostensibly includes different types of damages

3    such as property loss, tenant improvements as consequential damage for the breach, and lost

4    profits as part of Plaintiffs' business interruption coverage under the policy.  Plaintiffs' claim for

5    property damage has remained constant at $124,349 for FRT and $14,386 for Zone, since the

6    initial proof of loss was submitted to National.  The business interruption claim was never,

7    according to Plaintiffs, developed or investigated by National such that there was an original

8    demand for those amounts.  The differing damage numbers presented by Plaintiffs reflected

9    different time periods for calculating the business interruption losses.  Here, the vacillation

10   between Plaintiffs' pre-trial demand and the ultimate amount awarded militates against a finding

11   that Plaintiffs' damages were unascertainable.  The discrepancy between Plaintiffs' pre-trial

12   demand and the ultimate jury award says little about the ascertainability of the differing elements

13   of Plaintiffs' damages.

14                    **c.    Plaintiffs' Request for Prejudgment Interest Under Section 3287(a) is**
15                    **DENIED in part and GRANTED in part**

16         Section 3287(a) applies to situations "where there is essentially no dispute between the

17   parties concerning the basis of computation of damages if any but where their dispute centers on

18   the issue of liability giving rise to damage."  *Esgro Central, Inc. v. Gen. Ins. Co.*, 20 Cal. App. 3d

19   1054, 1060 (1971).

20         Here, National disputed not only its liability to pay any lost profits for either Zone or FRT

21   as a measure of damages, but also whether FRT and Zone suffered lost profits.  For example,

22   National presented expert testimony that FRT's business was not profitable.[42]   Thus, the amounts

23   of any lost profits were a subject of dispute among the parties' experts, and they did not agree on a

24   calculation of those damages.  *Esgro*, 20 Cal. App. 3d at 1062 (prejudgment not authorized where

25   the amount of damage "depends upon a judicial determination based upon conflicting evidence

26   and is not ascertainable from truthful data supplied by the claimant to his debtor").  Where the

27   parties dispute the amount or computation of damages, Section 3287(a) does not apply.  *Canavin*

28   _____
     [42] Unofficial Trial Transcript, August 19, 2014 (Day 8), Testimony of Gary Gray.

1   *v. Pacific Southwest Airlines*, 148 Cal. App. 3d 512, 524 (1983) ("because there was considerable

2   dispute between the parties concerning the relevant elements by which to compute damages,

3   rendering them not reasonably susceptible to ready and certain calculation, prejudgment interest

4   may not be awarded under section [3287(a)]" (citing *In re Pago-Pago Air Crash of January 1974*,

5   525 F. Supp. 1007, 1011-12 (C.D. Cal. 1981))).

6           Regarding FRT's tenant improvements, Plaintiffs maintain the improvements were insured

7   under the contract National breached and constituted a fixed amount which could have been

8   calculated had National investigated the claim or requested damage figures from Plaintiffs.  The

9   Court agrees these damages were subject to calculation.  However, it is not clear how much of the

10  aggregated award for FRT was comprised of tenant improvements and how much consisted of

11  business interruption damages – which would have included lost profits, the calculation and

12  amount of which the parties dispute.  Because of the aggregated damage award, even though

13  FRT's tenant improvements were ascertainable and subject to calculation, it is not clear what

14  portions of FRT's tenant improvements were awarded.

15          However, the amounts of the aggregated damage award reflect that the jury awarded FRT

16  $124,349 for its stolen equipment claim and $14,823 to Zone for its property damage.  The Proof

17  of Loss statement Plaintiffs' submitted to National was offered as evidence and sought the

18  amounts of $124,349 for stolen equipment and $14,823 for damage to the Cantina's doors.  The

19  jury found National breached the contract, and the property damage and stolen equipment were the

20  direct result of the breach.  It is also apparent the property damage and the stolen equipment were

21  included in the jury's aggregated verdict: FRT was awarded $2,224,349 and Zone was awarded

22  $274,823.  The dollar amount of the damage award logically reflects inclusion of the damaged

23  property and stolen equipment.  Moreover, National conceded at the November 18, 2014, hearing

24  that the property damage and stolen equipment represented ascertainable and liquidated claims.

25          Prejudgment interest is appropriate for the stolen property and property damage under

26  Section 3287(a).  *See Cal-Agrex, Inc. v. Tassell*, 258 F.R.D. 340, 353 (N.D. Cal. 2009) (awarding

27  prejudgment interest on ascertainable deposit amount where jury rendered aggregated verdict),

28

1    *aff'd* 408 F. App'x 58 (9th Cir. Jan. 7, 2011).  Prejudgment simple interest at a rate of 10 percent[43]

2    from February 4, 2010,[44] on a principle amount of $124,349 is $56,621 (($124,349 x 10%) x

3    (1662 / 365 days).  Prejudgment interest at 10 percent from February 4, 2010, on a principle

4    amount of $14,823 is $6,750 ($14,823 x 10%) x (1662 / 365).  The judgment shall be amended to

5    include these interest amounts.

6              **d.    Plaintiffs' Request for an Award of Prejudgment Interest Under Section
                       3287(b) is DENIED.**

7

8              Plaintiffs assert they are alternatively entitled to a rate of 10 percent per annum interest on

9    the jury award under Section 3287(b).  Section 3287(b) provides that "[e]very person who is

10   entitled under any judgment to receive damages based upon a cause of action in contract where the

11   claim was unliquidated, may also recover interest thereon from a date prior to the entry of

12   judgment, as the court may, in its discretion, fix, but in no event earlier than the date the action

13   was filed."  Cal. Civ. Code § 3287(b).  "The discretion conferred [under Section 3287(b)] is

14   limited by the purposes underlying interest awards . . . . "  *Gourley v. State Farm Mut. Auto Ins.*

15   *Co.*, 53 Cal. 3d 121, 133 (1991).  Prejudgment interest is intended to compensate a party for the

16   loss of the use of his or her property.  *Nordahl v. Dep't of Real Estate*, 48 Cal. App. 3d 657, 665-

17   66 (1975).  "It has long been settled that section 3287 should be broadly interpreted to provide just

18   compensation to the injured party for loss of use of money during the prejudgment period."

19   *Gourley*, 53 Cal. 3d at 132.

20             Unlike prejudgment interest under Section 3287(a), an award of prejudgment interest on

21   unliquidated amounts under Section 3287(b) is within the trial court's discretion.  Section 3287(b)

22   was "designed to allow trial courts flexibility in circumstances . . . where the exact amount of

23   damage is in dispute."  *A&M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 496 (1982).

24   Courts may consider a variety of factors in determining an award of prejudgment interest under

25   Section 3287(b), including (1) whether the party seeking interest was at fault for any delay in

26   ───────────────
     [43] Cal. Civ. Code § 3289(b).

27   [44] February 4, 2010, is the date National denied Plaintiffs' claim; 1662 is the number of days **between** February 4,
28   2010, and the date of judgment, August 25, 2014, excluding both February 4, 2010, and August 25, 2010.  This is the
     number of days Plaintiffs requested to calculate prejudgment interest.  (Doc. 376, 5:4-6.)

resolution of the case; (2) whether interest penalizes the defendant for litigating a bona fide dispute; and (3) whether the defendant refused a definite demand for settlement at the outset. *A&M Produce Co.*, 135 Cal. App. 3d at 495-96.

Plaintiffs offer no reason why the Court should exercise its discretion under Section 3287(b) to award interest.  The undersigned presided over two trials in this matter and, considering the evidence offered, finds that Plaintiffs were fully and fairly compensated by the jury's verdict. A further award of interest would not achieve the purpose of the statute, but would instead result in a penalty to National for litigating a bona fide dispute over coverage, particularly the dispute whether Plaintiffs made material misrepresentations voiding their policies.  The first trial resulted in a hung verdict, and a re-trial was required.  The first jury's inability to reach a verdict speaks to both the evidence offered as well as the bona fide nature of aspects of the dispute.  *See generally A&M Produce Co.*, 135 Cal. App. 3d at 495-96.  Plaintiffs' request for prejudgment interest under Section 3287(b) is DENIED.

## IV.   CONCLUSION

For the reasons stated above, it is HEREBY ORDERED that:

1.     National's motion to amend the judgment is DENIED;

2.     Plaintiffs' motion to amend the judgment to include post-judgment interest, accruing as of August 25, 2014, is GRANTED;

3.     Plaintiffs' motion to amend the judgment to include prejudgment interest is GRANTED IN PART and DENIED IN PART:

a.     Plaintiffs' request for prejudgment interest under Cal. Civ. Code § 3287(a) is granted in the amount of $56,621 for Plaintiff Fresno Rock Taco, LLC, and $6,750 for Zone Sports Center, LLC;

b.     Plaintiffs' alternative request for prejudgment interest under Cal. Civ. Code § 3287(b) is DENIED; and

//

//

//

4.    The Court shall issue an amended judgment that reflects the award of prejudgment and post-judgment interest consistent with this order.

IT IS SO ORDERED.

Dated:    **January 8, 2015**                                **/s/ Sheila K. Oberto**
                                                          UNITED STATES MAGISTRATE JUDGE